UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

MAR 1 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ROBERT KURSAR    *
                 *
    Plaintiff,   *
                 *
    v.           *    Civil Action No. 07-2001 (RBW)
                 *
TRANSPORTATION SECURITY    *
ADMINISTRATION   *
et al.           *
                 *
    Defendants.  *

* * * * * * * * * * * * * *

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Robert Kursar ("Kursar") previously worked for the defendants as a Federal Air Marshall ("FAM") until he was terminated due to unsubstantiated concerns raised by inaccurate and derogatory information provided to the TSA by a former colleague of Kursar. There is no dispute surrounding the status of Kursar's employment at the time of his termination, although there remain significant areas of dispute pertaining to the degree to which the TSA's determination – as well as its subsequent actions - ran afoul of Kursar's constitutional and statutory rights.

The thrust of the main argument of the defendants Transportation Security Administration and William Blake, Jr. (collectively referred to as "TSA") amounts to the idea that when it comes to probationary federal employees, federal agencies retain the ability to do whatever they want, whenever they want, to whomever they want, and using whatever information they want, absent certain – narrow – constitutional limitations. In light of the specific factual circumstances of this case, including various facets that have been revealed through prior administrative litigation, this Court should reject the TSA's

motion at this early stage and allow discovery to proceed. Whether the TSA's argument will prevail at a later stage, particularly on the merits, is something that can be determined at that time.

## FACTUAL BACKGROUND

On April 7, 2002, Kursar was selected for an excepted service position within the TSA as a FAM. His appointment was subject to a one-year probation period. Complaint at ¶7 (dated August 12, 2007). On April 22, 2002, Kursar's supervisor, Special Agent in Charge William Blake, Jr. ("SAC Blake"), had a conversation with Major Wellington Y. Hom ("Major Hom"), who had served with Kursar in an Army Reserve unit in 1994 and 1995. Major Hom provided information to SAC Blake concerning his past work experience with Kursar which Kursar has reason to believe was false, inaccurate and derogatory. Id. at ¶8.

### Decision To Terminate Kursar's Employment

On April 23, 2002, SAC Blake informed Kursar that were some questions regarding his employment application and that he would be relieved of his duties and placed on paid administrative suspension pending further background investigation. Kursar was not provided any details of the issues in question at that time. Id. at ¶9.

On April 25, 2002, SAC Blake issued a written notice of his intent to terminate Kursar during his probationary period for submitting false or incorrect information on his employment application and Standard Form 86 ("SF 86"), "Questionnaire for National Security Positions." Specifically, the written notice indicated that Kursar had failed to state he had been terminated from the Washington Army/Air National Guard and that he never had a security clearance revoked or suspended. The letter noted that Kursar had

2

five days to respond to the written notice. Id. at ¶10. See Exhibit "A" (consisting of April 25, 2002 notice of intent to terminate). By letter dated April 29, 2002, Kursar submitted his written reply with attachments, denying that he had intentionally provided false or incorrect information. Id. at ¶11. See Exhibit "B" at *1-*5 (Kursar's April 29, 2002 written response as submitted to SAC Blake). Amongst the attachments was a National Guard Bureau-22 "Record of Separation and Record of Service" Form ("NGB-22 Form") indicating that Kursar had been discharged "without personal notice, resignation, conditional ILO elimination" from the Washington State Army National Guard ("WSARN") as well as a phone number for Angie Watkins ("Ms. Watkins") at U.S. Army Human Resources Command, whom Kursar asserted – and continues to maintain - could verify that at no time had Kursar ever had a security clearance revoked or suspended. See Declaration of Robert Kursar at ¶7 (dated March 13, 2007)("Kursar Decl."), attached at Exhibit "C". See also Exhibit "B" at *1-*2, *6, *7 (particular portions from Kursar's written response regarding Ms. Watkins, as well as Kursar's NGB-22 Form and request for release from the WSARN). Kursar objected to the short time frame that had been afforded to him to draft his appeal, and he also requested an oral hearing which was denied. Complaint at ¶11.

By e-mail dated May 3, 2002, Greg Mclaughlin, the FAM Director, concurred with SAC Blake's recommendation that Kursar's employment with the TSA be terminated. See Kursar v. Dep't of Transportation, 2004 MSPB LEXIS 1344, *26 (August 26, 2004), attached at Exhibit "D". By letter dated May 3, 2002, Kursar was advised by SAC Blake that his employment had been terminated to promote the "efficiency of the service." The

letter stated that the termination was effective on May 8, 2002. Complaint at ¶12. See Exhibit "E" (consisting of May 3, 2002 notice of termination).

*Litigation Before The Merit Systems Protection Board*

On March 3, 2003, Kursar filed an appeal of his termination with the Merit Systems Protection Board ("MSPB"), claiming that the TSA's actions had been committed in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Complaint at ¶13. By decision dated August 26, 2004, Administrative Judge John W. Tapp ("Judge Tapp") denied Kursar's request for relief under USERRA, finding that Kursar could not demonstrate that his termination had been based on discrimination due to his reserve status or in retaliation for his prior USERRA complaint. Id. at ¶14. Judge Tapp also ruled that because Kursar was a probationary employee he did not constitute an "employee" within the meaning of 5 U.S.C. § 7511(a)(1) and that therefore the MSPB lacked jurisdiction to address the merits of Kursar's claim that the TSA's termination of his employment violated his due process rights. See Kursar, 2004 MSPB LEXIS 1344, *5, attached as Exhibit "D".

Judge Tapp did, however, state that he agreed with Kursar "that an adverse action most likely could not be sustained based on the charges brought and the evidence adduced," as there was "no evidence to support either the charge that appellant failed to state that he had been terminated from the Washington State Army/Air National Guard or the charge that appellant falsely stated that he had never had a security clearance revoked or suspended." Judge Tapp noted that SAC Blake's own testimony demonstrated that the "catalyst" for the decision to terminate Kursar was derived from both Major Hom's allegations concerning Kursar as well as SAC Blake's awareness that Kursar was a

4

probationary employee with limited appeal rights – not due to the veracity of the fact-based findings that Kursar had deliberately provided false or misleading information. Judge Tapp commented that Blake "went with his gut feeling to terminate appellant rather than attempting to sort out the accuracy of the information" and that SAC Blake's attempt to translate Major Hom's allegations into a more clear-cut justification for termination – i.e., falsification of an application – "was merely for appearances." Complaint at ¶14. See also Kursar, 2004 MSPB LEXIS 1344, *30, attached as Exhibit "D". Judge Tapp held that while the basis for Kursar's termination "may have been arbitrary and erroneous", the MPSB lacked the jurisdiction to address the issue in the context of Kursar's due process rights and could only address it within the context of his USERRA rights. Id. at *43, attached as Exhibit "D".

Kursar subsequently appealed Judge Tapp's ruling to the full MSPB, which affirmed Judge Tapp's conclusions. Defendants' Memorandum in Support of Motion to Dismiss at 3 (dated February 1, 2008)("Def's Memo"). Kursar then appealed to the Federal Circuit. Id. The Federal Circuit remanded the case back to the MSPB on Kursar's USERRA claims, but it reaffirmed the MPSB's conclusion that Kursar lacked any jurisdictional right to appeal the merits of his termination on due process grounds to the MSPB. Kursar v. Dep't of Transportation, 157 Fed. Appx. 306, 310 (Fed. Cir. 2005), attached as Exhibit "F". Kursar's MSPB litigation pertaining to his USERRA claims has since been resolved. Kursar v. Dep't of Homeland Security, 2008 MSPB LEXIS 497 (January 29, 2008), attached as Exhibit "G".

*Subsequent Attempts To Gain Civilian Employment*

Subsequent to Kursar's termination from the TSA and while he was pursuing his statutory rights through the MSPB, Kursar sought employment with a private civilian employer ("Employer A") with whom he had worked for five years prior to his acceptance of the FAM position. Upon being asked by Employer A for an explanation of the reasons behind Kursar's termination from the TSA, Kursar, as required by law, provided information detailing the justification cited by SAC Blake. Despite Kursar's attempts to explain the flaws underlying SAC Blake's arguments, Employer A informed Kursar that they could not rehire him and risk their own reputation. Complaint at ¶15.

In or around April 2006, Kursar applied for a position with another private civilian employer ("Employer B"). By letter dated May 19, 2006, Kursar was offered employment conditioned on his ability to pass a suitability or background investigation. Kursar was not required to nor did he sign any release authorization permitting disclosure of any records pertaining to him. Id. at ¶16.

On or about May 2006, Employer B, through use of a background investigator, initiated the background review of Kursar and undertook extensive field investigations of Kursar's background. Id. at ¶17. Upon information and belief, the TSA, through one of its officials, intentionally and unlawfully disclosed inaccurate and derogatory information concerning Kursar to the background investigator, namely that Kursar had been terminated for submitting false or incorrect information on his SF 86. Subsequently, the background investigator received copies of the relevant documents. Id. at ¶18.

By letter dated June 16, 2006, Kursar was informed that he had been found unsuitable for employment and that his conditional offer of employment had been rescinded. The

6

letter specifically stated that the decision to rescind the offer was "based on findings of the US Department of Transportation that you deliberately provided false or misleading information concerning relevant and material matters to authorities or officials in conjunction with the government security investigation." Id. at ¶19.

## ARGUMENT

The TSA has moved to dismiss this case pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Neither attempt should succeed at this juncture.

A motion for dismissal under "Rule 12(b)(1) [of the Federal Rules of Civil Procedure] presents a threshold challenge to the court's jurisdiction ...." Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)(citations omitted). Specifically, Rule 12(b)(1) permits dismissal of a complaint if the court "lacks jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Amer. Farm Bureau v. EPA, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). In evaluating whether it has subject matter jurisdiction, the court must construe the complaint liberally, and give the plaintiff the benefit of all reasonable inferences. See Tozzi v. EPA, 148 F. Supp. 2d 35, 41 (D.D.C. 2001), citing Scheuer v. Rhodes, 416 U.S. 232 (1974). The court must view the allegations as a whole, and a conclusory averment of subject matter jurisdiction negated by other allegations in the pleading should result in dismissal. Tozzi, 148 F. Supp. 2d at 41 (citation omitted).

This rule also imposes an "affirmative obligation [on the Court] to ensure that it is acting within the scope of its jurisdictional authority ... [and for this] reason, the 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a

12(b)(1) motion' than on a 12(b)(6) motion for failure to state a claim." <u>Fowler v. D.C.</u>, 122 F. Supp. 2d 37, 40 (D.D.C. 2000)(citations omitted).

A Court is therefore permitted to rely on documents beyond the pleadings to assure itself that it possesses jurisdiction. <u>See Land v. Dollar</u>, 330 U.S. 731, 735 n.4 (1947); <u>Coalition for Underground Expansion v. Mineta</u>, 333 F.3d 193, 198 (D.C. Cir. 2003); <u>EEOC v. St. Francis Xavier Parochial School</u>, 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); <u>Hohri v. United States</u>, 782 F.2d 227, 241 (D.C. Cir. 1986); <u>Artis v. Greenspan</u>, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). By considering documents outside the pleadings to resolve a challenge to the Court's subject matter jurisdiction the Court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment." <u>Haase</u>, 835 F.2d at 905 (emphasis in original). However, an independent inquiry may be undertaken by the Court to assure itself of its own subject matter jurisdiction without triggering unnecessary discovery. <u>Id.</u> at 907-908.

However, just because the Court has the power to go beyond the pleadings, it remains "settled law [that] the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone." <u>Herbert v. Nat'l Acad. of Science</u>, 974 F.2d 192, 197 (D.C. Cir. 1992). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." <u>Kowal v. MCI Commun. Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994); <u>Beverly Enters. Inc. v. Herman</u>, 50 F. Supp. 2d 7, 11 (D.D.C. 1999).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The district court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003).

The court need not, however, accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). In deciding a 12(b)(6) motion, district courts may typically consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)(citation omitted). However, the court may, in its discretion, consider matters outside the pleadings and thereby convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. See Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

## I.  KURSAR WAS DEPRIVED OF HIS FIFTH AMENDMENT DUE PROCESS RIGHTS AND IS ENTITLED TO A NAME CLEARING HEARING

### A.  Kursar's Fifth Amendment Claim Was Not Addressed On The Merits In His Prior Litigation Before The MSPB And The Federal Circuit And Therefore Is Not Precluded Under *Res Judicata.*

It is undisputed that under the doctrine of *res judicata*, or claim preclusion, a lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction. Smalls v. United States, 471 F.3d 186, 192 (D.C. Cir. 2006).

"Res judicata has two distinct aspects - claim preclusion and issue preclusion (commonly known as collateral estoppel) - that apply in different circumstances and with different consequences to the litigants." Sieverding v. ABA, 439 F. Supp. 2d 120, 123 (D.D.C. 2006). Under claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Drake v. Fed. Aviation Admin., 291 F.3d 59, 66 (D.C. Cir. 2002), quoting Allen v. McCurry, 449 U.S. 90, 94 (1980). Under issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Yamaha Corp. of Am. v. United States, F.2d 245, 254 (D.C. Cir. 1992), quoting Allen, 449 U.S. at 94.

Application of either method of preclusion here by the TSA is without merit. The TSA's arguments notwithstanding, the Federal Circuit did not issue a "final valid judgment on the merits" with regard to the validity of Kursar's Fifth Amendment claim. The TSA itself provides the very quote from the Federal Circuit's opinion that illustrates

this fact. See Def's Memo at 7, quoting Kursar, 157 Fed. Appx. at 309 ("And because of Mr. Kursar's status as a probationary employee, the Board correctly concluded that Mr. Kursar *had no right to appeal the merits of his termination to the MSPB*.")(emphasis added)), attached as Exhibit "F". Neither the MSPB or the Federal Circuit ever addressed whether Kursar had been deprived of his Fifth Amendment right to due process in relation to his termination, but rather solely addressed whether the MSPB had jurisdiction to consider Kursar's claim that he had been deprived of his due process rights pursuant to the Civil Service Reform Act ("CSRA"), 5 U.S.C. §§ 7500 et seq.

To be sure, Kursar is not attempting to relitigate here whether the MSPB had jurisdiction to hear Kursar's due process claim pursuant to the CSRA.[1] Instead, Kursar is seeking redress before this Court for the deprivation of his Fifth Amendment due process rights. Kursar had no ability to bring constitutional claims before the MSPB as the MSPB's jurisdiction is limited to statutory rights conferred upon federal employees by the CSRA. See 5 U.S.C. §§ 7513(d); see also United States v. Fausto, 484 U.S. 439, 448 (1988)(establishing that the CSRA provides the exclusive remedy, through the MSPB, to seek judicial or administrative review of the various types of personnel actions prohibited by the statute); Weaver v. United States Info. Agency, 87 F.3d 1429, 1432-33 (D.C. Cir. 1996).

---

[1] If Kursar were in fact asking this Court to reconsider that particular jurisdictional question, then the TSA would be correct in stating that the doctrine of *res judicata* would preclude Kursar's Fifth Amendment claims, as the Federal Circuit's ruling does arguably constitute a "final valid judgment" that Kursar's probationary employment status excluded him from seeking redress before the MSPB regarding deprivation of due process rights.

11

Therefore, the TSA's argument that Kursar's first and seventh causes of action asserting constitutional deprivations of due process are precluded by the doctrine of *res judicata* is without merit.

**B. Even As A Probationary Employee, Kursar Still Can Seek Judicial Review Of Colorable Constitutional Claims, Particularly His Fifth Amendment Liberty Interests, And He Has Not Yet Been Afforded Due Process**

1. *Kursar Is Not Precluded By The CSRA From Raising Colorable Constitutional Claims*

The ability of a probationary employee to seek judicial review of a colorable constitutional claim pertaining to a termination decision has not been found to be – and indeed can not be – precluded by the CSRA. The Supreme Court has delved into this issue at least twice and neither ruling provides support for the TSA's argument that the CSRA can preclude a colorable constitutional claim. See e.g., Fausto, 484 U.S. at 454 (ruling confined to issue of whether the enactment of the CSRA precluded a federal employee's right to raise a statutory claim derived from the Back Pay Act)[2]; Webster v. Doe, 486 U.S. 592, 603 (1988)(rejecting the idea that an agency's statutory authority pertaining to personnel actions could preclude a federal employee's right to seek judicial review for colorable constitutional claims). The Supreme Court in Webster emphasized

---

[2] The Supreme Court delved into the history behind the creation of the CSRA, and found that it was created to replace "the 'outdated *patchwork of statutes and rules* built up over almost a century' that was the civil service system". Fausto, 484 U.S. at 444 (emphasis added). The Supreme Court further detailed that the CSRA was created to streamline a uniform *statutory review* process related to personnel actions. Id. (emphasis added). At no point was the issue of constitutional claims mentioned as a source of judicial review that was also precluded by the CSRA.

the fact that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear". Id. at 603-04.[3]

The D.C. Circuit, for its part, has relied upon this guidance and held that while the CSRA can preclude judicial review of non-constitutional claims, it has no such effect on colorable constitutional claims.[4] See e.g., Weaver, 87 F.3d at 1433 (holding that once statutory remedies pursuant to the CSRA were exhausted, plaintiff had the right to seek judicial review of his constitutional claims); Nat'l Fed'n of Fed. Employees v. Greenberg, 983 F.2d 286, 289-90 (D.C. Cir. 1993)(finding that plaintiffs' Fifth Amendment claims pertaining to the government's judgments about what information employees must disclose during security clearance investigations were properly subject to judicial review); Spagnola v. Mathis, 859 F.2d 223, 229 (D.C. Cir. 1988)("[W]e do not suggest that the CSRA precludes the exercise of federal jurisdiction over the constitutional claims of federal employees and job applicants altogether.")(emphasis added); Carducci v. Regan, 714 F.2d 171, 173, 175 (D.C. Cir. 1983)(rejecting the

---

[3] The decision of the CIA in Webster to rely upon the Administrative Procedures Act and §102(c) of the National Security Act instead of the CSRA is most compelling as it can only serve to strengthen the idea that the CSRA's exclusive statutory remedies have no bearing on the issue of the ability to seek judicial review for colorable constitutional claims.

[4] Judge Collyer's recent holding in Cross v. Samper, 501 F. Supp. 2d 59 (D.D.C. 2007), should not be misconstrued as providing a conflicting legal conclusion. There Judge Collyer ruled that the CSRA barred the plaintiff's constitutional claims based upon the premise that the MSPB had already provided him with the relief – reinstatement and back pay - which formed the basis of his original constitutional claims. Therefore, plaintiff's constitutional claims were now moot. Id. at 60-61. To the extent that plaintiff was seeking compensatory damages, including attorneys fees, by means of his constitutional claims, Judge Collyer held that the monetary compensation afforded to the plaintiff by the CSRA precluded the awarding of any additional monetary damages. Id. at 62. In contrast, Kursar was not provided with any relief by the MSPB.

argument that the CSRA's lack of available statutory remedies for probationary employees constituted a "clear statement" by Congress that it meant to take away probationary employees' pre-CSRA right to pursue judicial review concerning colorable constitutional claims).[5]

Accordingly, the TSA's argument that Kursar is precluded from raising a colorable constitutional claim by way of the CSRA is without merit.

> 2.    *Kursar Has Been Deprived Of A Protected Liberty Interest Under Both The "Reputation" and "Stigma" Prongs*

Kursar is not basing his Fifth Amendment due process claims upon a protected property interest in his former employment at TSA but rather upon the TSA's deprivation of Kursar's protected liberty interests in relation to both his reputation and his future employment. For purposes of responding to the TSA's Motion, Kursar can demonstrate that he has been deprived of a protected liberty interest in regards to the circumstances surrounding the termination of his employment at TSA as well as the inaccurate and derogatory statements made to Employer B. Thus, the TSA's Motion should be denied (at least initially until after discovery is completed).

In order to state a Fifth Amendment due process claim, a plaintiff must show that he was deprived of a protected liberty interest. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569-570 (1972); M.K. v. Tenet, 196 F. Supp. 2d 8, 15 (D.D.C. 2001). To

---

[5] To be sure, a prerequisite before seeking judicial review based upon a colorable constitutional claim is that the individual first exhaust all available administrative remedies afforded by the CSRA. See e.g., Nat'l Treasury Employees Union v. King, 961 F.2d 240, 243 (D.C. Cir. 1992); Convertino v. Dep't of Justice, 393 F. Supp. 2d 42, 48 (D.D.C. 2005). Given the extensive amount of administrative litigation brought by Kursar before the MSPB in order to first pursue his statutory rights afforded by the CSRA and USERRA, there can be no dispute that he has exhausted all available administrative remedies.

14

establish a deprivation of a liberty interest in the employment context, a plaintiff must

show both that the government negatively altered his status and that the government:

> stigmatizes the employee or impugns his reputation so as to either (1) seriously damage his standing and associations in his community ("reputation-plus"), or (2) forecloses his freedom to take advantage of other employment opportunities by either (a) automatically excluding him from a definite range of employment opportunities within the government or (b) broadly precluding him from continuing his chosen career ("stigma or disability").

Id. at 15.

First, to fit within the "reputation plus" prong, a plaintiff must demonstrate not only

that the agency negatively altered his employment status, but also that the agency made

"public accusations that will damage [the plaintiff's] standing and association in the

community," in connection with the change in employment status. Doe v. Cheney,

885 F.2d 898, 910 (D.C. Cir. 1999).

There is no dispute that Kursar can show a change in employment status by way of

the termination of his employment. Def's Memo at 2. Moreover, defendant SAC Blake

testified under oath that he collected the information provided by Major Hom and

disseminated it within the TSA to otherwise appropriate officials – including Carolyn

Donahue ("Ms. Donahue") and Donna Bentley ("Ms. Bentley") in the Office of Human

Resources and FAM Director Greg McLaughlin - in order to determine what action to

take with regard to Kursar's employment. See Kursar, 2004 MSPB LEXIS 1344, *25-

*26, attached as Exhibit "D".[6]

---

[6] There remains an unresolved question surrounding whether SAC Blake actually spoke with the Office of Human Resources prior to issuing to Kursar the notice of proposed termination. Judge Tapp noted that SAC Blake's testimony that he talked with either Donna Bentley or Carolyn Donahue in the Office of Human Resources about conducting an investigation was later directly refuted by the testimony of Ms. Donahue. Kursar,

Lastly, it is also undisputed that the concerns about Kursar's honesty and integrity that were implicated by Major Hom's unsubstantiated allegations served as the catalyst for SAC Blake's erroneous findings that Kursar had submitted false or incomplete information and subsequently served as the proximate – and, in conjunction with SAC Blake's awareness of Kursar's limited rights as a probationary employee, arguably the exclusive – cause for the decision to terminate Kursar's employment with the TSA. See Kursar, 2004 MSPB LEXIS 1344, *30, attached as Exhibit "D". See also Exhibit "H" at *200-*201 (particular pages from the transcript of William Blake, Jr.'s March 2, 2004 testimony in Kursar v. Dep't of Transportation, 2004 MSPB LEXIS 1344). As a matter of law, the dissemination of the inaccurate and derogatory information unlawfully and unethically caused Kursar's employment with the TSA to be terminated and constituted a deprivation of Kursar's protected liberty interest in violation of the Fifth Amendment.

Second, the basis of a claim under the "stigma" prong is the combination of an adverse official action and "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities." O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir.1998), quoting Bd. of Regents, 408 U.S. at 573 (modifications in original).

As an initial matter, while an adverse employment action is one possible change in status that would suffice to implicate a liberty interest, the only thing is necessary is that

---

2004 MSPB LEXIS 1344, *22 n.40, attached as Exhibit "D". During his testimony, SAC Blake conceded that he had no explanation for the fact that Ms. Donahue denied conducting any investigation prior to his issuance of the written notice of intent to terminate on April 25, 2002, as well as the fact that the TSA confirmed that Ms. Bentley was not an employee at the time. Exhibit "H" at *152, *194-*195. See also Exhibit "I" at *45-*46 (particular pages from the transcript of Carolyn Donahue's March 3, 2004 testimony in Kursar v. Dep't of Transportation, 2004 MSPB LEXIS 1344)(indicating that no investigation was ever conducted).

there is "some tangible change in status". O'Donnell, 148 F.3d at 1141. Courts in this

Circuit have subsequently adhered to the policy that "there are several ways in which the

government may cause a change in status, including discharging the employee,

*foreclosing the employee's future employment opportunities*, or reducing the employee's

rank or pay." Ranger v. Tenet, 274 F. Supp. 2d 1, 7 (D.D.C. 2003), quoting Doe v. Casey,

796 F.2d 1508, 1523 (D.C. Cir. 1986))(emphasis added). See also Mosrie v. Barry,

718 F.2d 1151, 1161 (D.C. Cir. 1983)(finding that "foreclosure of a right to be

considered for government contracts in common with all other persons" sufficed as a

change in status). In the end, all that is necessary is that the plaintiff is able to

demonstrate that the government action "so severely impaired one's ability to take

advantage of a legal right ... that the government can be said to have 'foreclosed' one's

ability to take advantage of it". Id. Therefore, while the statements made by the TSA to

Employer B were not made in connection with the TSA's termination of Kursar's

employment, they were made in relation to Kursar's subsequent application for

employment with Employer B and therefore Kursar can still identify an "adverse official

action" in the form of the TSA's interference with Kursar's ability to pursue his chosen

profession.

    Indeed, a negative change in a plaintiff's status adequate to implicate a liberty interest

can be found where a federal agency's conduct has the "broad effect of precluding [the

employee] from pursuing [their] chosen career." See Kartseva v. Dep't of State, 37 F.3d

1524, 1528-29 (D.C. Cir. 1994)(finding that the agency's decision to declare Kartseva as

ineligible for assignment on agency projects due to unidentified "counterintelligence

concerns" that had emerged during a background investigation had sufficiently changed

Kartseva's status as it had the broad effect of precluding Kartseva from her chosen career without affording her any due process). See also Greene v. McElroy, 360 U.S. 474, 492 (1959)("Revocation of a security clearance possibly implicates a Fifth Amendment liberty interest where action has seriously affected, if not destroyed, plaintiff's ability to obtain employment [in his chosen career.]"). In the instant case, Kursar's status was adequately altered by way of the TSA's dissemination of inaccurate and derogatory statements concerning Kursar's termination – namely SAC Blake's erroneous and inaccurate fact-based findings – to Employer B. The TSA's dissemination of this information, as well as the likelihood that the TSA will continue to respond to third-party requests for information pertaining to Kursar with the same inaccurate and derogatory response, has arguably had the effect of broadly precluding Kursar from pursuing his chosen career without affording him any due process.[7] As a result, the TSA has caused a status change adequate to implicate a liberty interest under the "stigma" prong.

Accordingly, the TSA's argument that Kursar can not demonstrate a deprivation of a protected interest is without merit.

### 3. Kursar Can Demonstrate That The TSA Never Afforded Him Actual "Notice and Opportunity" To Respond To The Allegations And Clear His Name

As its last line of defense, the TSA argues that it provided Kursar with notice and the opportunity to respond to the allegations against him prior to terminating Kursar's

---

[7] It should be noted that so long as the TSA maintains records indicating that Kursar's termination was justified by virtue of the two fact-based findings, Kursar is also personally required by law to inform every potential employer of the TSA's stated rationale for his termination. See Kursar Decl. at ¶14. This legal obligation – which Kursar has no intention of violating – directly resulted in Employer A's decision not to rehire Kursar despite his previous association with that employer, and can reasonably be presumed to cause future problems with other private civilian employers.

employment. Def's Memo at 9. This argument seemingly ignores the conclusions drawn

by Judge Tapp concerning SAC Blake's actions.

> In my view, appellant is correct that Blake based his action entirely on the
> allegations contained in Major Hom's declaration. Although Blake attempted to
> translate Hom's allegations into something more clear-cut and serious for the
> purpose of the formal termination action, i.e., falsification of an application, it
> appears to me that this was merely for appearances. In reality, Blake was
> concerned about appellant as a result of Hom's allegations, Blake knew appellant
> was a probationary or trial employee who had very limited appeal rights, and
> *Blake was not really interested in taking the time and effort to determine the
> accuracy of Hom's allegations. Blake merely decided to err on the side of caution
> with the least effort necessary.*

Kursar, 2004 MSPB LEXIS 1344, *29-*30 (emphasis added), attached as Exhibit "D".

The TSA's argument also seemingly ignores the clear and concise statements which

Judge Tapp highlighted that were made by SAC Blake while testifying under oath.

Addressing the extent to which SAC Blake read – let alone evaluated – Kursar's written

response refuting the allegations that he had deliberately provided false or misleading

information, the testimony proceeded as follows:

> Question: So, all you did was glance at the DD-214, you decided it supported
> what Hom said, and based on that, you just decided you had to terminate him, is
> that right?

> Blake: *I glanced at the document, what I thought was the DD-214, now I know it's
> the NGB-22, specifically block 18. In addition to what Hom had shared with me,
> and the fact that he was on probation, I made a decision this isn't something I
> should be dealing with at this point* because we're building an agency, it's being
> built on integrity, it's being built on trustworthiness, and if I'm not comfortable
> with this individual, I can use the tool that the system has given me which is
> during the probationary period to terminate someone. I made that decision.

> Question: *As you sit here today though, you can't identify any specific false
> statements that Bob Kursar ever gave you, can you?*

> Blake: *No sir, I can not.*

> Question: And as you sit here today, we've looked at all this documentation, you can't see any documentation that shows that there's any false statements Mr. Kursar made, isn't that true?
>
> Blake: Not that I understand.

Id. at *31-*32 (emphasis added), attached as Exhibit "D".

Judge Tapp's conclusions and SAC Blake's statements paint a picture of a process which clearly fell short of what is commonly referred to as "notice and opportunity". See e.g., Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 208 (D.C. Cir. 2001)(affirming that "the fundamental requirement of due process is the opportunity to be heard *at a meaningful time and in a meaningful manner*")(emphasis added)(internal quotations omitted); Alexis v. District of Columbia, 44 F. Supp. 2d 331, 339 (D.D.C. 1999)(finding that "where a person's good name, reputation, honor or integrity is at stake because of the government's actions that notice and an opportunity to be heard are essential"). SAC Blake has already conceded under oath that he did not "carefully review" Kursar's written response enough to correctly identify the NGB-22 Form instead of incorrectly identifying it as a DD-214 "Report of Separation and Record of Service" Form ("DD-214 Form"), to determine if Kursar's "discharge without personal notice" from the WSARN constituted "termination",[8] or even to verify whether Kursar's position in the WSARN constituted civilian employment encompassed by Question 22 on the SF86. Exhibit "H" at *155-*160, *181.[9] Moreover, he admitted that he never contacted

---

[8] SAC Blake stated in his testimony that, in his view, the phrase "discharged without personal notice, resignation, conditional ILO elimination" suggested that Kursar had been discharged without honor but admitted that at the time he did not actually know what it meant. Exhibit "H" at *149-*150.

[9] During his testimony, SAC Blake conceded that because he was unable to definitively conclude whether Kursar's position with the WSARN constituted military employment or

Ms. Watkins or had ever personally seen any documentation verifying that Kursar had

ever had a security clearance revoked or suspended. Id. at *160, *172-*173, *191-*193.[10]

In fact, SAC Blake made it clear that his decision was largely based upon the fact that

Major Hom's allegations raised concerns in his mind about Kursar's honesty and

integrity and that, being aware of Kursar's limited right as a probationary employee, he

chose to seek termination of Kursar's employment. Id. at *200-*202. As Judge Tapp

highlighted, SAC Blake's issuance of the fact-based findings was "merely for

appearances" and based upon information which SAC Blake admitted under oath had

either been mistakenly evaluated or didn't even exist.

There is, quite honestly, nothing in the record that even remotely indicates that Kursar

was afforded "notice and opportunity". See Kursar Decl. at ¶13. If adopted the TSA's

position would arguably cripple the entire concept of "notice and opportunity" as it

would permit an agency to assert that the mere act of providing an employee with "notice

and opportunity" to submit a written response - ignoring whether the agency actually

reviews and evaluates the employee's written response and conducts any semblance of an

---

civilian employment, each of which pertain to different questions on the SF86, it was
possible that Kursar had actually accurately answered Question 22 on the SF86. Exhibit
"H" at *159-*160. Ms. Donahue testified that Question 22 did not, in fact, encompass
discharge from military service in the WSARN. See Exhibit "I" at *15. SAC Blake also
had no explanation for the fact that he could not identify any part of the NGB-22 Form
that specified that Kursar had been "terminated". Exhibit "H" at *150.

[10] It remains unclear how this particular charge ever emerged. During his testimony, SAC
Blake admitted that Major Hom never mentioned anything about Kursar's security
clearance being revoked or suspended. Exhibit "H" at *191. Instead, he again reiterated
that he believed that the Office of Human Resources had conducted an investigation and
determined that Kursar had indeed had his security clearance revoked or suspended at
one point. Id. at *173, *192-*193. Given the TSA's continued assertion that no
investigation ever took place, see Def's Memo at 13, as well as Ms. Donahue's testimony
that she never conducted any investigation the original basis for this charge remains
unclear.

investigation prior to terminating that employee – is somehow sufficient for purposes of defeating Fifth Amendment due process claims.

Accordingly, the TSA's argument that Kursar has already been afforded adequate "notice and opportunity" is without merit.

### C. Kursar Is Entitled To A Name Clearing Hearing Pursuant To The Fifth Amendment And Neither The MSPB Or The TSA Have Afforded Such A Hearing In The Past

The TSA ultimately asserts that Kursar has already been afforded two separate opportunities to clear his name by virtue of his MSPB litigation and his submission of the written response prior to his termination, and that no additional name clearing hearing is necessary. Def's Memo at 11-12.

As discussed above, Kursar's litigation before the MSPB and the Federal Circuit addressed only whether his termination violated his rights under USERRA, and did not address his Fifth Amendment due process rights in any capacity. To the extent that Kursar raised a due process claim before the MSPB, that claim was limited to his statutory due process rights pursuant to the CSRA – rights regarding which the Federal Circuit ruled Kursar could not raise before the MSPB - and had no bearing on his otherwise colorable constitutional due process claims under the Fifth Amendment. Therefore, the TSA's assertion that Kursar's past MSPB litigation provided a sufficient opportunity for Kursar to clear his name is not only without merit but also beside the point as it had no bearing on Kursar's ability to pursue a name clearing hearing by way of his Fifth Amendment due process rights. Moreover, Kursar has also demonstrated that the TSA did not provide Kursar with adequate "notice and opportunity" to respond to the

allegations made again him – and which the TSA relied upon – prior to the termination of his employment.[11]

Accordingly, the TSA's argument that Kursar is not entitled to a name clearing hearing is without merit.

### D. At A Minimum, Kursar Is Entitled To Discovery On His Fifth Amendment Claim Before The TSA Deserves Dismissal Of This Case

It was argued in <u>Kartseva</u>, one of the leading cases in this Circuit involving Fifth Amendment liberty interest and federal employment, that the plaintiff's discharge from employment as a Russian translator excluded her from future employment in her chosen career thereby implicating her Fifth Amendment liberty interest. 37 F.3d at 1526. The Court of Appeals reversed the District Court's dismissal in order to allow for discovery to take place so that <u>at least</u> three important questions could be resolved:

> (1) the scope of State's express disqualification - in particular, whether State's internal recommendations that Kartseva "not secure a position in support of any Department of State contract," refers only to the Statistica contract from which Kartseva was removed, to all Statistica contracts with State, or, indeed, to *any* State contract; (2) the extent to which State's action as to Kartseva would normally be available to and would legally affect other government agencies or private employers in their decisions whether to employ her or permit her to work on government contracts; and (3) the extent to which the disqualification will affect Kartseva's ability to pursue her vocation as a Russian translator.

<u>Id</u>. at 1530 (emphasis original). <u>See also</u> <u>Orange v. District of Columbia</u>, 59 F.3d 1267, 1275 (D.C. Cir. 1995)(discovery permitted to prove Fifth Amendment Constitutional

---

[11] Although this Circuit has not addressed this specific type of situation before, the Tenth Circuit addressed it in <u>Walker v. United States</u>, 744 F.2d 67 (10th Cir. 1984). That Circuit ruled that where a probationary federal employee's liberty interests were implicated by way of his termination for allegedly making a false statement on his employment forms, affording the probationary employee a mere five days to respond to the allegation did not adequately afford the employee a meaningful opportunity to respond and did not satisfy the hearing requirement of due process. <u>Id</u>. at 69-70.

claims); <u>Hogue v. Clinton</u>, 719 F.2d 1318, 1321 (8th Cir. 1986)(bench trial permitted on plaintiffs' Constitutional claims); <u>Bailey v. Kirk</u>, 777 F.2d 567, 569 (10th Cir. 1985) (depositions permitted on Fifth Amendment claims). These questions are similar, if not identical, to some of those that must be answered in this case: (1) what is the scope of the TSA's dissemination of inaccurate and/or unfavorable information concerning Kursar?; (2) to what extent is this information available to other government agencies or private employers?; (3) to what extent do the TSA's actions foreclose Kursar from pursuing his vocation; and (4) what regulations, rules or policies specifically applied to Kursar's situation and to what extent were the TSA's actions in compliance? Each of these questions is proper for discovery and should be answered prior to any contemplation of dismissal of this action.[12]

---

[12] Furthermore, both Kursar and <u>Kartseva</u> named unnamed government employees as defendants. <u>See</u> Complaint at *passim*; <u>Kartseva</u>, 37 F.3d at 1530. The Court of Appeals in <u>Kartseva</u> reversed the District Court's dismissal of the <u>Bivens</u> claims against the unnamed defendants because the *threshold* "'essential legal question whether the conduct of which the plaintiff complains violated clearly established law,'" was never decided. <u>Id</u>. (citation omitted). The Court elaborated that:

> [w]here, as here, the resolution of the threshold question of the existence of a clearly established constitutional right requires information on the nature and effects of the government action that is exclusively within the domain of the government, limited discovery may be appropriate to determinate that threshold issue.

<u>Id</u>. Although the issue of the individual unnamed defendants are not yet before this Court (as the unknown defendants remain just that until discovery), discovery against the primary agency defendants would overlap with the individual defendants. Another case from this Circuit that would appear to support Kursar's claim for discovery is that of <u>Doe v. United States Dep't of Justice</u>, 753 F.2d 1092 (D.C. Cir. 1985), which survived the government's Motion to Dismiss. <u>Id</u>. at 1102 ("Doe's discharge amidst the allegations of unprofessionalism implicates a constitutionally protected liberty interest in reputation and that, if those allegations were publicly disclosed, she is entitled to an opportunity to clear her name.") The Court of Appeals seems to comment in dicta that discovery should have been permitted by the District Court so the record would not be as sparse on appeal. <u>Id</u>. at 1098.

## II. KURSAR'S PRIVACY ACT CLAIMS SHOULD NOT BE DISMISSED

### A. Kursar's Privacy Act Claims Under 5 U.S.C. §§ 552a(e)(2) And (g)(1)(c) Should Not Be Dismissed For Failure To State A Claim As The Agency Failed To Both Investigate The Accuracy Of The Information Upon Which The Fact-Based Findings Were Based And Maintain Accurate Records Pertaining To Kursar

#### 1. Kursar Has Demonstrated That The TSA Did Not Review In Any Capacity Kursar's Response To The Allegations And Therefore Violated 5 U.S.C. § 552a(e)(2) When It Terminated Kursar Without First Investigating The Accuracy Of The Derogatory Information

Pursuant to 5 U.S.C. § 552a(e)(2) the TSA is required to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits and privileges under Federal programs." When conducting an investigation questions regarding a subject's credibility do not relieve an agency from collecting information first from the subject of the investigation. Waters v. Thornburgh, 888 F.2d 870, 873 (D.C. Cir. 1989).

It is axiomatic that in order to "collection information directly from the subject individual" in a manner that complies with the requirements of subsection (e)(2), the agency must not only receive the information but actually review it prior to making a determination that could be adverse to the individual's rights. The TSA, for its part, argues that it complied with subsection (e)(2) by way of permitting Kursar to submit a written response and that the decision to terminate Kursar's employment was made only after SAC Blake reviewed Kursar's response. Def's Memo at 13.

This argument must fail as a simple matter of fact. As has been previously demonstrated, see supra Exhibit "H", at no point did SAC Blake conduct even a cursory – let alone a substantive – review of Kursar's response. His concession that upon receiving the written response he did not even read it carefully enough to verify whether Kursar's

NGB-22 Form stated that Kursar had indeed been terminated from his employment with

the WSARN, see Exhibit "H" at *181, only serves to epitomize the extent to which SAC

Blake failed to adequately collect information from Kursar.[13] Furthermore, despite

Kursar's proactive attempt to provide SAC Blake with a contact person – in the form of

Ms. Watkins at U.S. Army Human Resources Command - who could verify that Kursar

had never had a security clearance revoked or suspended, SAC Blake admitted under oath

that he never followed up with Ms. Watkins. Exhibit "H" at *192-*193. SAC Blake's

failure to properly collect the information prior to making the decision to terminate

Kursar's employment undercuts the TSA's assertion that it did not run afoul of

subsection (e)(2) by virtue of the fact that it did not conduct any investigation. Indeed, in

the absence of a proper and sufficient review of Kursar's written response, the TSA's

argument that the circumstances didn't warrant an investigation is completely unfounded.

Accordingly, the TSA's argument that it did not violate 5 U.S.C. § 552a(e)(2) is

without merit.

---

[13] During a pre-hearing deposition, Kursar's then-counsel questioned SAC Blake about a sworn declaration that SAC Blake had signed which stated that an investigation by the Office of Human Resources advised that Kursar had been terminated from the Washington State Army National Guard and that Kursar's DD-214 Form verified that fact. Exhibit "J" at *40 (particular pages from the transcript of William Blake, Jr.'s October 21, 2003 pre-hearing deposition in Kursar v. Dep't of Transportation, 2004 MSPB LEXIS 1344). In the deposition, SAC Blake conceded that he could not identify anything on the NBG-22 Form – that had been mistakenly identified as a DD-214 Form by SAC Blake - that indicated that Kursar had been terminated and admitted not only that his sworn declaration contained an error, but that it was possible that a mistaken had been made and that Kursar had indeed answered both questions correctly. Id. at *44, *55-*56, *60.

    2.   *Kursar Has Demonstrated That The TSA's Finding That Kursar Had Omitted*
*Relevant Information and Provided False Information Was Proximately*
*Caused By The TSA's Failure To Maintain Accurate Records Pertaining to*
*Kursar In Violation Of 5 U.S.C. §§ 552a(g)(1)(c)*

Under 5 U.S.C. § 552a(g)(1)(c) an "individual may bring a civil action against the

agency" where "any agency":

> Fails to maintain any record concerning any individual with such accuracy, relevance,
> timeliness, and completeness as is necessary to assure fairness in any determination
> relating to the qualifications, character, rights or opportunities of, or benefits to the
> individual that may be made on the basis of such record, and consequently a
> determination is made which is adverse to the individual.

It is also well-established that the Privacy Act can not be utilized to amend or alter

"subjective opinions" of government officials that are based on otherwise accurate and

complete information. See Kleiman v. Dep't of Energy, 956 F.2d 335, 338 (D.C. Cir.

1992). See also Doyon v. United States, 304 F. Supp. 2d 32, 35 (D.D.C. 2004)

("[Plaintiff's] *challenge, then, is to BOP's use of the information, not to its accuracy,*

*relevance or completeness.*")(emphasis added).[14]

    The statute can, however, be used as a means of challenging the accuracy of

information that forms the basis of underlying fact-based findings. See e.g., Lee v. Geren,

480 F. Supp. 2d 198, 207-08 (D.D.C. 2007)(concluding that an agency's "findings" that

---

[14] The notion that the Privacy Act can not be invoked to collaterally attack a final agency
decision is further limited to the extent to which the "aggrieved party had an opportunity
to challenge it in an agency proceeding" or it has otherwise "been the subject of a judicial
or quasi-judicial action". Kennedy v. Andrus, 459 F. Supp. 240, 242 (D.D.C. 1978)
(addressing a situation in which the plaintiff had sought and received administrative relief
concerning the accuracy of his file to the extent that it noted that plaintiff had received a
reprimand for conduct which had otherwise been found to be proper). Since Kursar's
Privacy Act claim challenging the accuracy of the information underlying SAC Blake's
"findings" which ultimately resulted in the TSA's decision to terminate Kursar's
employment was not the subject of Kursar's prior litigation before the MSPB and the
Federal Circuit - which was rather addressing the limited issue of whether SAC Blake's
actions violated Kursar's rights under USERRA - there is no basis for a conclusion that
Kursar has already raised this challenge in a prior proceeding.

an individual falsified his resume and misused government property would be a proper subject for judicial review to the extent that the individual was challenging the accuracy of the information relied upon in making those "findings"); Kennedy v. Andrus, 459 F. Supp. 240, 242 (D.D.C. 1978)(explaining that the provisions of the Privacy Act can not be invoked to "challenge a conviction for a criminal offense received in another forum" but can be used to challenge the fact that the conviction "had been inaccurately recorded in his records").

In the instant case, Kursar is not challenging the TSA's ultimate determination that the two fact-based findings in and of themselves would have arguably justified the decision to terminate his employment. Instead, Kursar is challenging the accuracy and completeness of the information which formed the basis of the two fact-based findings. While the former is arguably precluded, the latter constitutes the exact type of error "of which Privacy Act suits are made" and is properly subject to judicial review.

To obtain relief under 5 U.S.C. § 552a(g)(1)(c), an individual must demonstrate that he: "(1) has been aggrieved by an adverse determination; (2) the [agency] failed to maintain [his] records with the degree of accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the inaccurate records was the proximate cause of the adverse determination". McCready v. Nicholson, 465 F.3d 1, 10 (D.C. Cir. 2006). There is not likely any dispute surrounding the first prong, so the focus of Kursar's analysis must address the second and third prongs in order to succeed on his claim under 5 U.S.C. § 552a(g)(1)(c).

Courts in this Circuit have upheld the notion that so long as the information contained in an agency's files is capable of being verified, then 5 U.S.C. § 552a(g)(1)(c) imposes an

obligation upon the agency to take "reasonable steps" to maintain the accuracy of the information to assure fairness to the individual. See e.g., Lee, 480 F. Supp. 2d at 211-12; Sellers v. Bureau of Prisons, 959 F.2d 307, 312 (D.C. Cir. 1992). Taking such "reasonable steps" can arguably satisfy the agency's obligation under the second prong. See Doe v. United States, 821 F.2d 694, 700 (D.C. Cir. 1987)(en banc)(holding, with respect to "unknowable" facts, that the "verification steps and checks undertaken by the Department, and the corrections made based upon that review, ... rendered the March 1981 ROI a record maintained with the accuracy and completeness reasonably required to assure fairness to Doe"). But see McCready, 465 F.3d at 19 ("[W]e fail to see how McCready's presence at a meeting is not a 'fact' capable of verification and why the VA need not correct that fact or *show that it took reasonable steps to verify its accuracy*")(emphasis added).

It strains credulity to believe that the TSA can argue that it took "reasonable steps" to maintain the accuracy of its file pertaining to Kursar by virtue of the fact that SAC Blake failed to even conduct a cursory review of Kursar's written response, the TSA freely admits that it did not conduct any investigation into the substance of Kursar's written response, and that SAC Blake was unable to produce any written documentation supporting his findings. The TSA's actions, largely through SAC Blake, instead typify the opposite of taking "reasonable steps", as it chose instead to forego taking *any* action to ensure the accuracy of its records.

Furthermore, when the challenged information at issue can be ascertained, this Court retains the authority to determine whether the challenged information is accurate. See Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 583 (D.C. Cir. 2002)(holding that

"where truth can readily be ascertained, it is 'feasible, necessary, and proper, for the agency and, *in turn, the district court to determine whether each filed item of information is accurate*'")(emphasis added), quoting Doe, 821 F.2d at 699. See also Deter v. United States Parole Commission, 85 F.3d 655, 658 (D.C. Cir. 1996). This Court arguably can make such a determination *de novo*. Lee, 480 F. Supp. 2d at 212. In the case of Kursar, there can be no dispute that the truth regarding whether Kursar deliberately provided false or misleading information is easily verifiable. See Kursar Decl. at ¶¶15-16. Therefore, this Court is empowered to determine for itself whether SAC Blake's fact-based findings were based upon inaccurate or incomplete information.

Regardless of whether this Court makes that determination, in order to satisfy the third prong and obtain relief under 5 U.S.C. § 552a(g)(1)(c), Kursar must prove a "causal relationship between the allegedly erroneous record and an adverse determination based on that record". Hubbard v. EPA, 809 F.2d 1, 4-5 (D.C. Cir. 1986). "A guiding principle in this analysis is that a document memorializing an adverse personnel decision does not constitute the proximate cause of that personnel decision for purposes of an adverse-determination claim." Lee, 480 F. Supp. 2d at 210 (ruling that notices of an intent to suspend plaintiff did not cause the suspension but rather indicated preliminary decisions which were superseded by the final notice of decision). In this case, Kursar has demonstrated that SAC Blake chose to rely upon his inaccurate and cursory review of Kursar's NGB-22 Form and his as-yet-unsubstantiated assertion that someone at the TSA verified that Kursar's security clearance had been revoked as the basis upon which to issue his two fact-based findings. These erroneous, inaccurate and derogatory fact-based findings that Kursar had deliberately provided false or misleading information

30

subsequently served as the proximate – and indeed exclusive - causes of the TSA's ultimate decision to terminate Kursar's employment.[15]

Lastly, the TSA's assertion that Kursar is attempting to use the Privacy Act as a mechanism for overturning his termination constitutes a clear distortion of the facts. To the contrary, Kursar's claim for relief under 5 U.S.C. § 552a(g)(1)(c) is limited to demonstrating that the TSA failed to maintain Kursar's record with such accuracy as necessary to assure fairness in the subsequent fact-based findings by SAC Blake that served as the proximate – and exclusive – cause of the decision to terminate Kursar's employment. Complaint, Prayer for Relief, ¶2. To the extent that Kursar is seeking the rescission of his termination, that prayer for relief is confined to his Fifth Amendment claim that the TSA's actions constituted a deprivation of his liberty interests without affording him adequate due process, see Complaint, Prayer for Relief, ¶5, and therefore bears no relation to his Privacy Act claims.

Accordingly, the TSA's argument that Kursar is not entitled to relief under 5 U.S.C. § 552a(g)(1)(c) is without merit.

### 3. The Record Is Currently Insufficient To Determine If Kursar Can Demonstrate That He Is Entitled To Relief Under 5 U.S.C. § 552a(g)(4)

A plaintiff bringing an action under 5 U.S.C. §552a(g)(1)(c) can also recover actual damages pursuant to 5 U.S.C. § 552a(g)(4) so long as the plaintiff can demonstrate that the agency "acted intentionally or willfully in failing to maintain accurate records."

---

[15] Judge Bates' recent ruling in Lee clearly demonstrates the type of situation in which the plaintiff can not satisfy the third prong. Id. 480 F. Supp. 2d at 211 (concluding that since the final decision to suspend plaintiff was based upon thirteen findings but plaintiff was only challenging two of the findings, while not even challenging the accuracy of the information underlying those particular findings, plaintiff could not demonstrate that the two contested findings were the proximate cause of his suspension).

McCready, 465 F.3d at 10 n.5, quoting Deters, 85 F.3d at 657. This Circuit has ruled that acting "intentionally or willfully" must constitute "something greater than gross negligence" in maintaining accurate records. See Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987). To satisfy this burden, the plaintiff must be able to demonstrate that the offending agency acted "without grounds for believing [its actions] lawful" or that it "flagrantly disregarded" the rights guaranteed under the Privacy Act. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987), quoting Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984).

In the case of Kursar, the record is currently insufficient to determine one way or another if the TSA's actions constituted "something greater than gross negligence", as it remains unclear upon what information the TSA – through the actions of SAC Blake and/or the as-yet-unidentified TSA officials – relied in reaching the fact-based findings that Kursar had deliberately provided false or misleading information. As those findings served as the proximate cause for the ultimate decision to terminate Kursar's employment, and the details of those findings were disseminated to Employer B in violation of the TSA's obligations under the Privacy Act, identifying the specific information – if indeed any exists – that produced the fact-based findings would provide clarity as to whether the decision to terminate Kursar's employment resulted from a gross failure to maintain accurate records. Accordingly, until discovery is completed, there can be no determination as to whether Kursar is entitled to relief under 5 U.S.C. § 552a(g)(4).

**B. Kursar's Privacy Act Claims Under 5 U.S.C. §§ 552a(e)(5) And (e)(6) Should Not Be Dismissed For Failure To Exhaust Administrative Remedies As Kursar Is Not Required To Exhaust Administrative Remedies Due To The Futility Of Asking For An Amendment Which The TSA Has Already Refused To Provide**

It is undisputed that, ordinarily, prior to bringing an action under 5 U.S.C.

§§ 552a(e)(5) and (e)(6) against an agency to amend a record, a plaintiff must first

exhaust administrative remedies. M.K. v. Tenet, 99 F. Supp. 2d 12, 20 (D.D.C. 2000)).

This requirement can be waived, however, in "exceptional circumstances" where an

agency has articulated a very clear position on the issue which it has demonstrated it

would be unwilling to reconsider and the plaintiff has thereby demonstrated the certainty

of an adverse decision indicating that pursuit of administrative remedies would be clearly

useless. U.D.C. Chairs Chapter, Am. Ass'n. of Univ. Professors v. Board of Trustees, 56

F.3d 1469, 1470 (D.C. Cir. 1995)(internal quotations omitted). See also Randolph-

Sheppard Vendors of America v. Weinberger, 795 F.2d 90, 106 (D.C. Cir. 1986)("When

the agency has already made it abundantly obvious that it would not correct the error and

would not conform its actions with the strictures of [the applicable statute], *it would be*

*meaningless to compel the hapless plaintiff to pursue further administrative remedies*

*simply for form's sake*.")(emphasis added), quoting Daedalus Enterprises, Inc. v.

Baldridge, 563 F. Supp. 1345, 1350 (D.D.C. 1983)(finding that requiring plaintiff to

exhaust administrative remedies by submitting a written petition to enforce compliance

with a statute in a manner which defendant agency has already made clear it is unwilling

to do would be clearly useless).

In this case, the TSA has remained adamant in its position that it has complied with

all applicable obligations, including under the Privacy Act, in relation to its collection,

evaluation and utilization of the information upon which SAC Blake's findings were based and which served as the proximate cause for the decision to terminate Kursar's employment. See Def's Memo at 12-15. The facts, however, convey a situation that was decidedly not in compliance with the TSA's obligations. First, Kursar submitted a written response refuting the assertion that he had submitted false or incomplete information pertaining to his discharge from the WSARN and his past retention of a security clearance, a written response which SAC Blake has admitted under oath he never read or reviewed prior to terminating Kursar's employment. Second, SAC Blake has conceded under oath that he could not produce any written documentation that demonstrated that Kursar had deliberately provided false or misleading information. Despite these occurrences, the TSA has shown no indication that it is willing to admit that any of the information that formed the basis of SAC Blake's findings was inaccurate, incomplete or otherwise in need of amendment or modification. Therefore, any requirement that Kursar exhaust administrative remedies by submitting a written petition for amendment of his records would be "clearly useless", as the TSA has made it patently clear that it is "unwilling to reconsider" its position with regards to the accuracy of the information.

   Accordingly, the TSA's argument that Kursar's claims under 5 U.S.C. §§ 552a(e)(5) and (e)(6) should be dismissed due to failure to exhaust administrative remedies is without merit.

**C. Kursar's Privacy Act Claims Under 5 U.S.C. §§ 552a(e)(5) And (e)(6) Asserting That The TSA Disseminated Inaccurate Information To A Third Party Without Authorization Should Not Be Dismissed Pursuant To The Privacy Act's "Routine Use" Exemption Or The Notion That Plaintiff's Employment History With The TSA Is Public Record**

It is undisputed that the "routine use" exemption of the Privacy Act permits agencies to disclose to a non-Federal third party information regarding a former employee's termination – without the individual's consent or authorization – to the extent that the "date and nature of action" is detailed on the Standard Form 50 ("SF50"), "Notification of Personnel Action". See Def's Memo at 16 (citing 65 Fed. Reg. 24732, 24735, pt. dd(4) (April 27, 2000)). The TSA asserts that, pursuant to this exemption, it was not under any obligation to obtain a release from Kursar prior to disclosing to Employer B that Kursar had been terminated by the TSA. Def's Memo at 16. For the reasons detailed below, this argument is not just flawed it is entirely without merit.

Kursar's challenge to the invocation of the "routine use" exemption is not to the validity of the exemption in and of itself, but rather that its invocation here is both inappropriate and misplaced. Kursar's SF50 indentifies the "nature of action" as "Termination During Prob/Trial Per". See Exhibit "K". Nowhere on the SF50 is there any additional explanation identifying the underlying fact-based findings that justified the termination. Despite that fact, when Kursar's offer of employment with Employer B was rescinded on June 16, 2006, he was told by that the rescission was "based on findings of the US Department of Transportation that you deliberately provided false or misleading information concerning relevant and material matters to authorities or officials in conjunction with the government security investigation." Complaint at ¶19. In light of

this information, the TSA's assertion that it disseminated information to Employer B within the confines of the "routine use" exemption is wholly without merit.

As a last resort, the TSA argues that the information is not subject to the Privacy Act because it is a matter of public record by way of Kursar's previous litigation before the MSPB and Federal Circuit on his USERRA claim. Def's Memo at 16-17. This argument is equally without merit. The fact that Kursar's explanation of the inaccuracy and incompleteness of the information upon which SAC Blake relied in reaching his fact-based findings is arguably a part of the "public record" does nothing to relieve the TSA of its obligations under the Privacy Act. Indeed, despite what has been revealed about the information that formed the basis of SAC Blake's findings, the TSA has done nothing to date to correct its records pertaining to Kursar and has continued – and arguably will continue - to disseminate the erroneous and inaccurate findings that Kursar deliberately provided false or misleading information during his security background investigation. Cf. Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 966 n.24 (D.C. Cir. 1980)("In the present case, the determination that Old Dominion lacked integrity had already been communicated through Government channels and would undoubtedly have been recommunicated every time ODDPI bid on a subsequent contract."). Such dissemination has already resulted in Kursar's loss of one job offer and will arguably continue to result in additional losses of job offers so long as the TSA is permitted to disseminate the erroneous and inaccurate findings. Not only should Kursar not be expected to have to re-explain the situation to every single private civilian employer in the hope that the employer will actually listen, but by way of the Privacy Act, he is entitled to not have to take such action.

Accordingly, the TSA's argument that Kursar's claims under 5 U.S.C. §§ 552a(e)(5) and (e)(6) must fail as a matter of law is without merit.

## D. At This Initial Stage, Discovery Is Justified On Kursar's Privacy Act Claims

Courts routinely first permit discovery in Privacy Act cases such as this one before dismissal is contemplated. Even a quick review of decisions within the last decade reveals this to be true. See e.g., Tripp v. DoD, 219 F. Supp. 2d 85, 93-94 (D.D.C. 2002); Murphy v. United States, 167 F. Supp. 2d 94, 97 (D.D.C. 2001); Alexander v. FBI, 194 F.R.D. 316, 319 (D.D.C. 2000); Sirmans v. Caldera, 27 F. Supp. 2d 248, 249 (D.D.C. 1998); Scarborough v. Harvey, 2007 U.S. Dist. LEXIS 36952, *2 (D.D.C. May 22, 2007); Doe v. Goss, 2007 U.S. Dist. LEXIS 2708 (); Hutchinson v. Tenet, 2003 U.S. Dist. LEXIS 26182 (D.D.C. August 28, 2003); Melius v. Nat'l Indian Gaming Comm'n, 2000 U.S. Dist. LEXIS 22747, *1 (D.D.C. July 21, 2000).

Given the past MPSB litigation on Kursar's USERRA claim, discovery need not be extensive or overly burdensome here. Indeed, to some extent discovery will be designed to address questions left unresolved by Kursar's MSPB litigation, such as whether: (1) an investigation was conducted by the Office of Human Resources at the request of SAC Blake subsequent to receiving information from Major Hom, and, if so, whether that investigation concluded that Kursar had been terminated from the WSARN within the context of Question 22 on the SF86 and that Kursar had at some point had a security clearance revoked or suspended; (2) the ultimate decision to terminate Kursar's employment was made by SAC Blake or by the Office of Human Resources; and (3) there ever existed any documentation that supported SAC Blake's fact-based findings. Moreover, discovery would likely seek to resolve the issue of what documentation was

relied upon by the TSA in formulating its response to Employer B's request for information pertaining to Kursar.

It is fairly apparent that this is an area ripe for clarification through discovery, particularly as it relates to information that would be in the possession of the defendants and not the plaintiff. As is whether or not the TSA acted in an "intentional and willful" manner with respect to its failure to ensure the accuracy of information upon which the subsequent fact-based findings that Kursar had deliberately provided false or misleading information were based.

## CONCLUSION

Based on the foregoing, the defendants' Motion to Dismiss should be denied without prejudice and the plaintiff should be permitted to conduct discovery.

Date: March 15, 2008

Respectfully submitted,

Robert Kursar (*pro se*)

38

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>ORDER</u>**

Upon consideration of Plaintiff's Opposition to Defendants' Motion to Dismiss, and

the entire record herein, it is this _____ day of March 2008, hereby

ORDERED, that defendants' Motion is denied; and further

ORDERED, that plaintiff is permitted to conduct discovery.

_____
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# EXHIBIT A



**U.S. Department of Transportation**
**Transportation Security Administration**

Federal Air Marshal Service
Seattle Field Office, ACT-700N
500 Powell Avenue SW
Renton, Washington 98055
April 25, 2002

Mr. Robert A. Kursar
#17-2345 Cranley Dr.
Surrey BC Canada V4A9G5

Dear Mr. Kursar:

The purpose of this letter is to officially notify you of my intent to terminate your employment with the Transportation Security Administration as a Federal Air Marshal (FAM) in accordance with 5 CFR 315.805. Your proposed termination is based upon the following:

You provided false and/or incorrect information on the Standard Form 86, Questionnaire for National Security Positions, which you submitted to the agency. Specifically in response to question 22, you failed to state that you were terminated from the Washington State Army/Air National Guard in June 1996. In addition, in response to question 26, you falsely stated that you did not have a security clearance revoked or suspended.

Before a final decision is made, you are entitled to submit a written answer to this notice of proposed termination, and furnish any affidavits or other material in support of your answer. Your complete answer must be received within five (5) calendar days (April 29, 2002) from the date of this letter. Any answer shall be fully considered before reaching a final decision on my proposal for termination of your employment.

If you need any additional information regarding your proposed termination, you may contact me at (425) 917-7400.

Sincerely,

William Blake, Jr.
Special Agent In Charge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                          *
ROBERT KURSAR            *
                          *
     Plaintiff,          *
                          *
                          *     Civil Action No. 07-2001 (RBW)
           v.            *
                          *
TRANSPORTATION SECURITY  *
ADMINISTRATION           *
et al.                   *
                          *
     Defendants.         *
*     *     *     *     *     *     *     *     *     *     *     *     *     *
```

# EXHIBIT B

William Blake, Jr.
Special Agent In Charge
Seattle Field Office

April 29, 2002

Dear Mr. Blake:

Pursuant to our conversation and notice regarding proposed termination of
employment for providing false or incorrect information on the SF 86. Specifically in
response to question 22, failing to state that I was terminated from the Washington
National Guard. In addition, that I falsely stated that I did not have a security clearance
revoked. Please accept this explanation and attached evidence conclusively verifying my
assertions.

This information you have received is clearly incorrect, and any termination would be an
injustice. I hope this document and attachments will verify that the information you relied
upon is erroneous. I have been truthful and forthcoming, without deliberate omission or
falsification in my entire hiring process to include the SF 86, my security interview with
the OPM Investigator and recent conversations with you.

1. I was never terminated from the Washington National Guard. I was a member who
served in the Guard, and voluntarily resigned my commission, and received my discharge
under honorable conditions with no derogatory information, no bar from reenlistment or
punishment of any type. I resigned under the duress of an order from my civilian
employer to do so; on 14 November 1995 (I will subsequently address this incident that is
directly related) I received my discharge paperwork in July 1996. Shortly afterwards,
January 1997; I re-entered the military; recruiters confirmed the information above and I
continue to serve to this date. I recently completed a tour of active duty, ending March
15, 2002. I currently have over 19 years military service and have never received any
form of discipline. The only termination or unfavorable circumstances from employment
that I have received is clearly documented in the SF 86 #22 and explained to you in our
interview. I also mentioned this to the OPM investigator at the time of my security
interview. I explained that the issue also had a military component and that I had brought
to the interview documentation and findings. I asked if he needed clarification or further
explanation regarding this event. The investigator made note and stated that at this stage
the additional explanation or documentation was not needed.

2. I have never, to the best of my knowledge, ever had a security clearance suspended or
revoked. To the contrary, while attempting to be diligent in preparing my SF 86, and in
conjunction with my recent military deployment, I contacted my military command's
security section as recent as Dec 2001, and made inquiries as to my security status. I
specifically asked whether my clearance was active, expired, cancelled, suspended or
revoked. I spoke to numerous individuals at that section who told me that my record in
the National database documented a cancelled clearance in Jan 1998, but never a
revocation or suspension. I was told that an interim clearance would be granted. They

did state however that I might be deemed ineligible for a final top secret because of my employment activities in Canada. The name and telephone number of the individual that will verify this information is Ms. Angie Watkins, US Army Reserve Personnel Command, Security section, 314 592 0000 ext. 2241 or alternatively 800 323 0793. I have asked for written confirmation of the above, my request was denied, due to the time frame. They did state that they would confirm that I made the inquiries as to my status, telephonically if an enquiry were made. Based on this information provided from the US Army security section of my Command, I completed question #26 of the SF 86.

3.I have included my request for discharge/ resignation from the National Guard, the re-enlistment document stating no derogatory information exists, current discharge certificates, and contact information from my Command security section outlining my inquiries prior to completing the SF 86 and their responses. As these documents clearly show, I was not aware of any security clearance revocation, nor was I terminated from the Washington National Guard, nor should there be any derogatory connotations. This should demonstrate clearly that the information used as a basis for proposed termination is in error. My entries on the SF 86 are not misleading, intentionally incorrect or omitted to the best of my knowledge.

---

In addition, although unrelated to the specific reasons cited in your termination proposal, I would like to give some further details that might help clarify or shine additional light and the totality of this event and another relevant incident in order to avoid a situation similar to this in the future. I hope I can demonstrate that these two incidents are basically one of the same. I was terminated from my employment with the Whatcom County Sheriff's Office in Feb 1996. This incident arose from illegal orders made by the former Undersheriff of that department regarding participation in the military reserves and his belief that his orders were lawful, and that I intentionally violated them.

I attempted to comply with the Undersheriff's directives by taking military assignments during my scheduled vacation, or alternatively using compensatory time off. However I was scheduled to attend diver training in Florida pursuant to a directive from my military Commander. Rather than attempt to take military leave, I asked my Commander if I could take the training immediately during my annual leave. As the school slots for military personnel were full, the only other alternative was to attend the course as an additional student using my status as a law enforcement officer. I submitted a law enforcement memorandum requesting to attend the course as a law enforcement officer during the course period of my scheduled time off. My military Commander approved this method and funded the training.

During this training course, the Undersheriff was notified off my attendance in military training. He subsequently, initiated an internal investigation, and asked the National Guard to do the same. The internal charges were on the basis of disobeying his orders not to participate in military training, conduct unbecoming an officer, general misconduct, willful violations of his orders, etc. He asked the National Guard to conduct

an investigation of waste and abuse, (funds for training) and conduct unbecoming an officer due to accessing the school as a civilian rather than a military member. During this internal investigation, the Undersheriff suggested that if I volunteered to resign from the National Guard, he would consider this in his internal investigation. I contacted my military Commander, who advised me to resign. I resigned from the Washington National Guard, solely due to employment concerns and at the advise of my military commander. Shortly afterwards, I was terminated from the Sheriff's Office based on the charges mentioned above. I do now, as I have all along, admitted that I may have used poor judgment in using my law enforcement status to gain access to the school. In my defense I would add that the extenuating circumstances of illegal orders from a supervisor and conflicting orders from my military commander contributed to my decision. I feel that I had the best intentions.

The Washington National Guard also conducted an investigation. I was told that during this time I could not have access to my unit or it's personnel. I was never made aware of any personnel security clearances being revoked. I had made my chain of command aware of how I was attending the school, and my attendance in a law enforcement role was based solely on an attempt to comply with my military commander's order and the Sheriff's office concerns. The military did find major errors in my personnel file regarding courses completed and qualifications and inaccuracies that took up most of the investigation findings. However this was administrative error and later cleared up and reorganized, during a request for correction of military records and attributed to commonplace confusion between Active, Reserve and National Guard systems. Their investigation results showed no evidence of wrong doing on my part, other than a minor allegation of not being more forthcoming as to/ or misrepresenting my true status to the school in Florida, which I had admitted to all along. If the Washington National Guard is now asserting that there was other wrongdoing, this is contrary to due process. Any other information or allegations have never been presented to my military counsel or me. Clearly it is not inappropriate to have to defend against information from 7 years ago that I, my current military command nor military counsel at the time have not been made aware of. I cannot, nor should I have to defend my reputation on rumor, hearsay, or any other non-supported allegation.

I was advised by my military counsel at the time, LCDR Rick Cowan, that I could address the issue of any misrepresentation while at the training course in front of a board by withdrawing my current resignation, but since I had already submitted my resignation months earlier, the National Guard agreed to let my resignation paperwork go through. I explained to my counsel, and submitted documentation to the Guard, that I would let my previous resignation stand in lieu of appearing before the board only if I would receive my discharge under totally honorable conditions with no derogatory result or implications. I made it clear that if my discharge was less than honorable or with any unfavorable connotation, I wished to withdraw my resignation and appear before a board to explain my reasons for attending the course in the manner I did. The Washington National Guard agreed, granting me a discharge under fully honorable conditions. However, if during the course of this discharge they revoke a security clearance as protocol, I was unaware of this. Based on my experience with military records, it is

entirely possible that a clearance may have been suspended or revoked without my notification. I would hope, and have been led to believe that if revocation of a security clearance were punitive in nature, one should have to be notified and given a chance to respond or appeal. In my case this was not done. Nor was my current command or military counsel aware of any such action, unfavorable reasons or other allegations of misconduct.

Subsequent to my discharge from the National Guard, and the resulting termination from the Sheriff's Office, I re-enlisted into the Army Reserve. During this enlistment process, recruiters contacted the Washington Guard personnel clerk who issued my discharge certificate. It was confirmed in writing that there was no derogatory information regarding my discharge. I was told that if there were derogatory, unfavorable or unsatisfactory performance information, I would have received a barred reenlistment code. This was not my case. I was immediately re-enlisted into the reserves were I continue to serve to date. Again, attempting due diligence and being conscientious in order to correct errors in my personnel file, I retained the independent services of Lieutenant Colonel Oakes, a field grade Judge Advocate General officer. I asked Colonel Oakes to investigate irregularities in my personnel file and have corrections made. It should be noted that there was a subsequent Administrative process regarding military records, corrections and reenlistment in the National Guard.

Regardless of any of the above, hearsay, innuendo, rumor or any unsubstantiated accusation or allegations, I was not terminated from the Guard, did not resign under unfavorable circumstances, nor had to address any other issue. My resignation was solely at the request of my civilian employer and processed once I chose discharge in lieu of appearing before a board. I received a discharge under fully honorable conditions and I have never seen any documentation showing any referral to other than honorable. My current Command has stated that to interpret my Guard discharge as a termination or in any way unfavorable, is a contradiction to Army regulation. I have never received any type of military discipline in my 19+ years of service.

In response to the termination from the Whatcom County Sheriff's Office, I requested the US Department of Labor to investigate my termination. The US Department of Labor conducted an extensive investigation, and exonerated my actions by finding that the County had violated my rights under Federal Statute regarding access to military leave and that each charge related to my accessing military service, as entitled and protected under Federal Law. In statements by both the Sheriff and Undersheriff, they admitted that after reviewing the Federal Law it was recognized that their orders were in fact unlawful and they did not realize that I was using my own compensatory time off. My military Commander also gave a statement verifying that if I did not complete these military assignments as he ordered, he would have considered it for action under the Uniform Code of Military Justice. I have attached documentation from the US Department of Labor's senior investigator outlining the above. It should be noted that during my 9 1/2 years of employment, I received no negative reports, no written reprimands, and no disciplinary actions yet several commendations.

In the six years since that termination I have continued to be in public service, in high positions of trust and National security, and military service again with no negative reports, reprimands or any disciplinary actions.

I hope this explanation with the attached official documentation from the Army Reserve gathered in only one full working day, conclusively demonstrates the information received regarding my SF 86 responses being false or intentionally omitted is erroneous. I have been unable to contact Commander Rick Cowan who handled my resignation, nor Lieutenant Colonel Oaks, who handled the corrections of my military records. I have attached a copy of a letter from Colonel Oaks sent to an attorney who worked with the Dept of Labor in investigating my unlawful termination by the Sheriff's Office.

As I'm sure you can understand, it is extremely disturbing to be falsely accused of terminable offenses based on unsubstantiated rumor or misinformation, without any offer to explain the circumstances. Furthermore, it is fundamentally unfair to have to contact military channels, gather correspondence and records and file a response in one working day, in order to disprove misinformation, which investigators have gathered over weeks.

I respectfully request that any adverse ramifications or termination proposals be dismissed conclusively, that I be returned to regular duty and eligibility returned for the promoted position you referred me to. You mentioned in our interview, if I was honest with you and the service, I could expect in return 100% support from you and the Air Marshals Service. I hope that this clearly demonstrates that I have been and it turn, request your support. As stated previously, I have made no attempt to mislead, omit, falsify or conceal any facts in my background. If there were questions, clarification unintentional corrections or further explanation needed, I would have gladly answered them. I was told by the OPM investigator that I would have a chance to do so if questions arose.

The fact remains that I have never faced any criminal charges, administrative or non-judicial punishment for any activity from the military, or any discipline in a civilian capacity other than that mentioned above and on my SF 86. There is no evidence that would demonstrate that I am anything less than, reliable, trustworthy, of good conduct or character and loyal to the United States.

Respectfully Submitted,


Robert A. Kursar

Attachments
1. Resignation letter to Washington National Guard dated 14 November 1995
2. Discharge certificate, honorable conditions, from Washington National Guard
3. Re-enlistment documents verifying contact between recruiters and WA Guard and no derogatory information existed at that time.

DEPARTMENTS OF THE ARMY AND THE AIR FORCE
NATIONAL GUARD BUREAU

# REPORT OF SEPARATION AND RECORD OF SERVICE

REPORT OF SEPARATION AND RECORD OF SERVICE IN THE[1] ARMY NATIONAL GUARD OF WASHINGTON AND AS A RESERVE OF THE[2] ARMY

1. Insert either Army or Air 2. Enlisted personnel only - Insert only Army or Air Force

| 1. LAST NAME - FIRST NAME - MIDDLE NAME | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| KURSAR, ALEXANDER ROBERT | ARNGUS/WAARNG | [redacted] |

| 4. DATE OF ENL | YR | MO | DA | 5a. RANK | 5b. PAY GRADE | 6. DATE OF RANK | YR | MO | DA | 7. DATE OF BIRTH | YR | MO | DA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 94 | 07 | 11 | CW2 | W2 | | 93 | 05 | 26 | | 63 | 10 | 15 |

| 8a. STATION OR INSTALLATION AT WHICH EFFECTED | 8b. EFFECTIVE DATE | YR | MO | DA |
|---|---|---|---|---|
| DET 1, 19TH SFG, BUCKLEY, WA 98321 | | 96 | 07 | 24 |

9. COMMAND TO WHICH TRANSFERRED
N/A

| 10. RECORD OF SERVICE | YRS | MOS | DAYS |
|---|---|---|---|
| (a) NET SERVICE THIS PERIOD | 02 | 00 | 14 |
| (b) PRIOR RESERVE COMPONENT SERVICE | 00 | 00 | 00 |
| (c) PRIOR ACTIVE FEDERAL SERVICE | 00 | 00 | 00 |
| (d) TOTAL SERVICE FOR PAY | 02 | 00 | 14 |

| 11. TERMINAL DATE OF RESERVE/MILITARY SERVICE OBLIGATION | YR | MO | DA |
|---|---|---|---|
| | 00 | 00 | 00 |

12. MILITARY EDUCATION (Course Title, number of weeks, month and year completed)
NONE

13. PRIMARY SPECIALITY NUMBER, TITLE AND DATE AWARDED (Additional speciality numbers and titles)
NONE

14. HIGHEST EDUCATION LEVEL SUCCESSFULLY COMPLETED
SECONDARY/HIGH SCHOOL 12 YRS (Gr 1-12) COLLEGE 00 YRS

15. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED THIS PERIOD (State Awards may be included)
NONE

16. SERVICEMAN'S GROUP LIFE INSURANCE COV
☒ YES ☐ NO
AMT $ 200,000

| 17. PERSONNEL SECURITY INVESTIGATION a. TYPE | b. DATE COMPLETED |
|---|---|
| NONE | N/A |

18. REMARKS
SOLDIER DISCHARGED WITHOUT PERSONAL NOTICE, RESIGNATION, CONDITIONAL ILO ELIMINATION. NGB FORM 22 WAS MAILED FIRST CLASS TO THE LAST KNOWN ADDRESS AS SHOWN IN ITEM 19 BELOW.

19. MAILING ADDRESS AFTER SEPARATION (Street, RFD, City, County, State and Zip Code)
PO BOX 3063
BLAINE, WHATCOM, WA 98231

20. SIGNATURE OF PERSON BEING SEPARATED
SOLDIER NOT AVAILABLE FOR SIGNATURE

21. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER
RITA JANE VACEK
CW2, MIL PERS TECH

22. SIGNATURE OF OFFICER AUTHORIZED TO SIGN
Rita Jane Vacek

23. AUTHORITY AND REASON
NGR 600-100 RESIGNATION, CONDITIONAL ILO ELIMINATION

| 24. CHARACTER OF SERVICE | 25. TYPE OF CERTIFICATE USED | 26. REENLISTMENT ELIGIBILITY |
|---|---|---|
| UNDER HONORABLE CONDITIONS | NONE | N/A |

27. ☐ REQUEST ☐ DECLINE COPIES OF MY NGB FORM 22 INITIALS ______

NGB FORM 22 (Replaces NGB Form 22 ...) INDIVIDUAL COPY

DEPARTMENT OF THE ARMY
ODA 9A5, Co. D, 1st Bn 19 SFG (A)
Buckley, WA 98321

WA-19SF-1-D-ODA9A5                                    14-Nov-45

MEMORANDUM THRU Major Brian J. Boquist, Commander, D Company,
1st SF Bn. 19th Special Forces Group (A), 445 North River
Avenue, Buckley, Washington 98321

FOR Colonel Michael S. Croy, Troop Commander, 96th Troop
Command, 715 S 11th St., Tacoma, Washington 98405

SUBJECT: Request immediate release from Washington Army
National Guard

1.  Request approval of immediate release from Washington
Army National Guard.  This request is based on conflicts
arising with my civilian employer over military leave for
training and drills.  At a time of selection for new
assignments within my civilian capacity, I have been made
aware that continued membership in the National Guard may
effect me in the selection process.  I feel that my
release at this time is the most desirable course of action.

2.  I understand that an AR 15-6 investigation regarding my
attendance at a military school has been initiated.  At the
conclusion of this investigation, or as soon as possible
please approve this request.

3.  Please feel free to contact me at commercial 604-535-
8606.

Robert Kursar
1Lt. IN, WA ARNG
ODA Commander

**U.S. Department of Labor**                    Veterans' Employment and Training Service



1111 Third Avenue - Ste. 800
Seattle, Washington 98103
(206)553-4831

August 18, 1997

Robert Kursar
12597 22nd Avenue
Surrey, B.C. V4A 2B6

RE:     Uniformed Services Employment
        And Reemployment Rights Act [USERRA]

Dear Mr. Kursar:

This agency administers the USERRA, which provides specific job protection rights to veterans,
Reservists, and National Guard members. This letter is to provide verification that you have filed
an official complaint under the Uniformed Services Employment and Reemployment Rights Act of
1994. Your complaint has been found to have supported prima-facie showing that your rights
under the law have been violated by your former employer.

USERRA provides for the proper reinstatement, retention in employment, initial hire, promotions,
and non-discrimination for covered members of the Uniformed Services. I have enclosed a copy
of the Act for your review.

Please feel free to share this information with your employer/prospective employer. If you, or
your employer have any additional questions regarding the application of the Act, please feel free
to contact the undersigned on (206)553-4831.

Sincerely,

KAREN M. MARIN
Senior Investigator

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| DEPARTMENT OF | * | |
| HOMELAND SECURITY | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF ROBERT KURSAR

The undersigned hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I am the plaintiff in this action and make this Declaration on personal knowledge. This Declaration is submitted in support of my Opposition to Defendants' Motion to Dismiss.

2.  I was formerly employed by the Transportation Security Administration ("TSA") as a Federal Air Marshall ("FAM") in the Seattle Field Office from April 7, 2002 until I was terminated on May 8, 2002. Prior to joining the TSA, I had served in a host of different capacities – such as law enforcement trainer, detective, and task force agent – with several different U.S. government agencies, including the Army and the DEA.

3.  This lawsuit pertains to the deprivation of my Fifth Amendment rights – as well as my rights under the Privacy Act – by way of the actions of Special Agent in Charge William Blake, Jr. ("SAC Blake") in effectuating the termination of my employment with the TSA, as well as by the TSA's dissemination of inaccurate and derogatory information pertaining to my termination to a private civilian employer without prior authorization from me.

4. On April 25, 2002, SAC Blake provided me with a written notice of intent to terminate my employment due to my alleged failure to indicate on the Standard Form 86 ("SF 86"), "Questionnaire for National Security Positions" that I had been terminated from the Washington State Army National Guard ("WSARN") and that I had never had a security clearance revoked or suspended. I was informed that I had five days to provide a written response. I was obviously in Seattle at that time and had to travel to Canada to locate documents to dispute the charges. Additionally, since two of the five days fell over the weekend, I was considerably limited in my ability to contact military and government personnel, as the offices were obviously closed.

5. On April 29, 2002, I provided SAC Blake with my written response denying that I had failed to provide information by virtue of the fact that I had not been terminated from the WSARN and that I had never had a security clearance revoked or suspended.

6. I included a copy of my National Guard Bureau-22 Form ("NGB-22 Form"), which stated that I was "discharged without personal notice, resignation, ILO elimination" from the WSARN. To briefly explain the context, I had chosen to resign from the WSARN rather than appear before a separation board. At the time, I was a member of the WSARN but I also had separate civilian employment with the Whatcom County Sheriff's Office ("Whatcom County"), where I served as a Deputy Sheriff and DEA Joint Task Force Agent. By way of my employment with Whatcom County, I managed to secure a spot to attend a class at a military dive school. I chose to utilize this method so that my attendance could fall under my "vacation days" afforded to me by Whatcom County. The WSARN considered my use of my civilian law enforcement status as a method to attend a class that was full for military students to be "conduct

2

unbecoming an officer". Given the impact that my military duties were already having on my civilian employment responsibilities, I was ordered by Whatcom County to cease my military activities. Therefore, in lieu of separation proceedings, I resigned from the WSARN and received my discharge documents by mail.

7.  I also included a letter stating that I had spoken with Ms. Angie Watkins ("Ms. Watkins") at U.S. Army Human Resources Command in St. Louis, Missouri both before I submitted the SF86 and related documents, as well as after SAC Blake issued the notice of intent to terminate my employment. I clearly stated that Ms. Watkins had confirmed for me on both occasions that I had indeed never had a security clearance revoked or suspended. I included contact information for Ms. Watkins in the letter and indicated that she was available to be contacted by the TSA for its own independent verification.

8.  By letter dated May 3, 2002, I was informed by SAC Blake that I was being terminated for submitting false or incomplete information on my employment application and SF86.

9.  Replaying the events of those few weeks in an effort to determine what had happened and how the charges had not been sufficiently resolved by my written response, I remembered that I had seen Major Wellington Y. Hom ("Major Hom") in the Seattle FAM Field Office on April 22, 2002 speaking with SAC Blake. Major Hom had been an Army Reserve colleague of mine in 1994 and 1995. I surmised that Major Hom must have informed SAC Blake about a Uniformed Services Employment and Reemployment Rights Act ("USERRA") complaint that I had filed against Whatcom County over both military leave issues and the dive school incident. A close friend of Major Hom had been investigated – and I believe reprimanded – over his involvement in the incidents.

3

10. Given that I couldn't determine what – if indeed any - legitimate factual basis SAC Blake had for the stated charges of submitting false or incomplete information, it was my view that a more reasonable explanation for my termination was that Major Hom had provided SAC Blake with inaccurate and derogatory information regarding my past USERRA complaint and that SAC Blake had terminated me in retaliation. Accordingly, I brought my case before the Merit Systems Protection Board ("MSPB") on March 3, 2003 on the grounds that my termination was in fact executed in retaliation for my prior USERRA complaint in violation of the provisions of that statute, as well as being in violation of my due process rights as a federal employee pursuant to the Civil Service Reform Act.

11. While my MSPB litigation was ongoing, I began seeking employment in the private sector. I first approached a private civilian employer ("Employer A") for whom I had worked for five years prior to my acceptance of the FAM position. When Employer A asked for an explanation regarding my termination from the TSA, I explained – as required by law – that the TSA had concluded that I had deliberately provided false or misleading information and had chosen to terminate my employment. Although I tried to explain what I viewed as the considerable deficiencies in the TSA's conclusions, I was informed that hiring me would pose too much of a risk to the reputation of Employer A.

12. In April 2006, I applied for a position with another private civilian employer ("Employer B") and on May 19, 2006 I was offered the position, conditioned on my ability to pass a background investigation. At no point was I asked or ordered to sign – nor did I sign – any form providing authorization for a third party to disclose records pertaining to me to Employer B. By letter dated June 16, 2006, Employer B informed me

4

that the offer of employment was being rescinded "based on findings of the US Department of Transportation that you deliberately provided false or misleading information concerning relevant and material matters to authorities or officials in conjunction with the government security investigation."

13. During my MSPB litigation, I had discovered that SAC Blake – and thereby the TSA – had based his entire decision to terminate my employment upon his mistaken interpretation of the NGB-22 Form, his personal "concern" that Major Hom's allegations raised an issue about my honesty and integrity, and his awareness that as a probationary employee I had limited rights. It became quite clear that SAC Blake had not conducted any investigation prior to issuing his erroneous conclusions that I had submitted false or incomplete information and that his assertion in his May 3, 2002 letter that he had "carefully considered" my written response was completely untrue. I was quite honestly shocked to hear SAC Blake testify under oath that:

- he did not even understand what "discharge without personal notice, resignation, ILO elimination" stood for and could not identify any place on my NGB-22 Form that stated that I had been "terminated" from the WSARN;

- he was conceding under cross-examination that his own signed sworn statement contained errors, including its incorrect identification of my NGB-22 Form as a DD-214 Form;

- he had never seen any documentation stating that I had ever had a security clearance revoked or suspended; and

- he had based his decision off an investigation allegedly conducted by Carolyn Donahue and Donna Bentley in the Office of Human Resources, especially given

5

that Carolyn Donahue testified under oath that not only had she never conducted any investigation but that Blake had merely informed her that he wanted documents drawn up to terminate my employment, as well as the fact that that Donna Bentley was not even employed at that time by the TSA.

14. In light of that, I chose to seek relief before this Court for violations of the Fifth Amendment and the Privacy Act by way of SAC Blake's actions in terminating my employment without even the slightest semblance of due process, as well as his failure to adequately collect and review information from me prior to making his determination. Moreover, I viewed the problems I had run into trying to seek employment since May 2002, particularly the fact that I was legally obligated to attempt to try to explain away the TSA's erroneous conclusions and that the TSA had disclosed –without my permission – those same conclusions to Employer B, as also constituting violations of my rights under the Fifth Amendment and the Privacy Act. In my view, the TSA's ongoing retention of the erroneous conclusions – based upon inaccurate and incomplete information –was foreclosing any ability on my part to pursue any semblance of a career in my chosen profession. I have every intention of continuing to adhere to my legal obligations to be forthcoming and truthful in future job interviews, and so long as the TSA is permitted to maintain those erroneous and inaccurate conclusions, I will be forced to disclose them to potential future employers.

15. The extent to which the information was inaccurate and incomplete is not overly complicated or otherwise confusing. I resigned from the WSARN in lieu of separation proceedings. My resignation from the WSARN did not constitute a termination, and my discharge was not in any way designated as being under "dishonorable conditions". The

6

veracity of these facts is easily identified by merely properly reviewing the NGB-22 Form.

16. Additionally, I can state without hesitation that at no point in time when I was filling out the SF86 and related documents for the FAM position did I have knowledge that my security clearance had at any point been revoked or suspended. In order to cover my bases, I contacted Ms. Watkins before I submitted the SF86 to the TSA and verified that my security clearance had indeed not been revoked or suspended. It was my explicit intent to avoid any type of confusion similar to that which eventually occurred by way of SAC Blake's unsubstantiated assertion. When SAC Blake alleged that I had failed to indicate that my security clearance had been revoked or suspended, I contacted Ms. Watkins again and she verified once again that there was not any record of any revocation of suspension of my clearance.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date:   March 13, 2008

Robert Kursar

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

# EXHIBIT D

1 of 1 DOCUMENT

ROBERT A. KURSAR, Appellant, v. DEPARTMENT OF TRANSPORTATION,
Agency.

DOCKET NUMBER SE-315H-03-0187-I-2

MERIT SYSTEMS PROTECTION BOARD

*2004 MSPB LEXIS 1344*

August 26, 2004

**COUNSEL:**
[*1]

William B. Knowles, Esquire, Seattle, Washington, for the appellant.

Harry Abramson, Esquire, Washington, D.C., and Paula M. Billingsley, Esquire, Irving, Texas, for the agency.

**OPINION BY: TAPP**

**OPINION:**

**BEFORE**

John W. Tapp

Administrative Judge

**INITIAL DECISION**

On March 3, 2003, Robert A. Kursar appealed to the Board from the action of the Transportation Security Agency (TSA), terminating him from employment as a Civil Aviation Security Specialist with the Federal Air Marshal (FAM) Service, Seattle Field Division. Appellant was terminated effective May 8, 2002, approximately one month after he commenced employment, based on a charge that he had provided false or incorrect information on a Standard Form 86, "Questionnaire for National Security Positions." Appellant claimed that he was terminated in violation of Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). A hearing was conducted on March 2-3, 2004.

For the reasons explained below, appellant's request for relief under USERRA is DENIED.

**ANALYSIS**

Procedural background and jurisdictional posture

Effective April 7, 2002, appellant was given an excepted appointment as a Civil Aviation Security Specialist (Federal [*2] Air Marshal), FV-1801-G, subject to a one-year trial period. n1 The Standard Form 50-B (SF 50-B) "Notification of Personnel Action" form documenting his appointment indicates that appellant did not have a veterans' preference (items # 23 and # 35) and that his position was in the excepted service (item # 34). n2

2004 MSPB LEXIS 1344, *2

n1 Appeal I-1, file tab 4, agency subtab 4j.

n2 Appeal I-1, file tab 4, agency subtab 4i.

By memorandum dated April 23, 2002, appellant was notified that he was being relieved of his duties and placed on administrative suspension pending the results of an ongoing background investigation required for a security clearance. n3 By letter dated April 25, 2002, appellant was notified that the agency intended to terminate his employment because he had "provided false or incorrect information on a Standard Form 86, "Questionnaire for National Security Positions." n4 Specifically, it was charged that appellant failed to state that he had been terminated from the Washington State Army/Air National Guard and that he falsely stated that he had never had a security clearance revoked or suspended. Appellant was given five days to respond to the notice.

n3 Appeal I-1, file tab 9. (attachment to appellant's submission).

[*3]

n4 Appeal I-1, file tab 4, agency subtab 4g.

On April 29, 2002, appellant submitted his written reply with attachments. n5 Appellant denied that he intentionally provided any false information and he explained at length the facts from his perspective. Appellant also objected to the short time within which he was required to reply.

n5 Appeal I-1, file tab 1, attachment to appellant's "Appeal Form."

By letter dated May 3, 2002, appellant was advised that a determination had been made that the facts supported the agency action and that he would be terminated to promote the efficiency of the service. n6 Appellant was advised that he could appeal to the Merit Systems Protection Board (the Board) if he believed the action was being taken "as a result of discrimination because of marital status or political reasons, or based on conditions arising before your appointment and you alleged that the action is procedurally improper." n7

n6 Appeal I-1, file tab 4, agency subtab 4f.

n7 The is a reference to the appeal rights accorded probationary employees in the competitive service under 5 C.F.R. Part 315H ("Probation on Initial Appointment to a Competitive Position"). Appellant, however, was an employee in the excepted service who was serving a trial period.

[*4]

Appellant was terminated effective May 8, 2002. n8 The SF 50-B "Notification of Personnel Action" documenting appellant's termination reflects that it was a "termination during prob/trial per" (item # 5-B) under the legal authority of P.L. 104-50 (item 5-D). n9 This SF 50-B also indicates that appellant did not have a veterans' preference (items # 23 and # 35) and that his position was in the excepted service (item # 34). Finally, the "Remarks" section stated that the separation was a "termination during probationary period" (item # 46).

n8 Appeal I-1, file tab 4, agency subtab 4e.

n9 P.L. 104-50 refers to the Department of Transportation and Related Agencies Appropriations Act, 1996, 1995 U.S.C.C.A.N. (109 Stat.) (DOT Act).

2004 MSPB LEXIS 1344, *4

Appellant did not file his appeal with the Board until almost ten months later, on March 3, 2003. n10 In his appeal, appellant maintained that the agency relied on erroneous information, gave him an inadequate amount of time to respond to the charge against him, and then failed to consider his response. n11 Appellant requested a hearing.

n10 Appellant claimed that he filed an earlier appeal by facsimile to the Board's "Washington, D.C. office" on May 11, 2002. Appellant further claimed that, although he received no response from the Board, a Senate staff person with whom he had been working advised him that "it would take some time." (Appeal I-1, file tab 1, narrative attachment to "Appeal Form," page 3). Appellant never submitted documentary evidence of this alleged earlier appeal.

[*5]

n11 Appeal I-1, file tab 1.

Appellant was ordered to show cause why his appeal should not be dismissed because he was not a preference eligible who had completed one year of current continuous service and, therefore, he was not an employee for the purpose of appealing to the Board. n12 Appellant replied that from 1993 to 1996, he had been a Task Force Agent with the Drug Enforcement Administration (DEA) and that position was the same as, or similar to, his Federal Air Marshal (FAM) position. n13 Appellant made a subsequent submission, arguing that the Board had jurisdiction because the agency had made a negative suitability determination, had committed harmful procedural error, and had committed a prohibited personnel practice. n14

n12 Appeal I-1, file tabs 2 and 5.

n13 Appeal I-1, file tab 6.

n14 Appeal I-1, file tab 9.

Still later, appellant claimed that he had been the victim of discrimination based on his prior military service and that the Board had jurisdiction under USERRA. Appellant stated:

Having given specific thought to any legitimate actions which would have initiated this action, it occurs to me that this investigation began after receiving my promotion [*6] to Supervisory Criminal Investigator and subsequent interview by my supervisor, SAC [Special Agent In Charge] Blake. I was questioned in some detail about my military activities, previous responsibilities and how those duties would effect my responsibilities with the Air Marshal's service. Although it was obvious to me during the interview that my supervisor, SAC Blake was concerned about those activities, and how they would effect [sic] operations in light of the current and impending massive call-ups, I gave the conversations no further thought. In retrospect it does seem that the reasons for those inquiries relate to USERRA, and thus the questioning was discriminatory. I can think of no legitimate reasons for making these inquiries other than for serious concern about my reserve activities and their effect on my position. It occurs to be [sic] more than a coincidence that within a day or two after our conversation, these false allegations are brought against me. I feel that based on my supervisors [sic] obvious disappointment with my reserve status, added by an immediate suitability investigation, a request to provide current military [*7] status documents, the agency alleging false charges for termination knowing that these false charges could not be sustained, is due to my duty in the uniformed service. After careful consideration of the totality of the events, I can see no other motivation for the actions. n15

n15 Appeal I-1, file tab 11, page 3.

The record was reopened for the parties to address the appellant's USERRA claim. n16 Appellant made another submission, rearguing his previous claims. n17 The agency agreed that USERRA was applicable to appellant but maintained he had not made a "viable" claim. n18 I found that appellant had made a viable claim, explained the law under USERRA, n19 and scheduled a hearing. n20

n16 Appeal I-1, file tab 13.

n17 Appeal I-1, file tab 14.

n18 Appeal I-1, file tab 15.

n19 Appeal I-1, file tab 16.

n20 Appeal I-1, file tab 17.

The agency submitted a written declaration dated May 22, 2003, from William Blake, Jr., appellant's supervisor and the Acting Special Agent in Charge (ASAIC) in FAM's Seattle Field Office. n21 Blake declared that he had been appellant's supervisor during appellant's entire tenure and that he had not terminated appellant based on appellant's [*8] military status. Blake maintained that the "catalyst" for the action was a visit and a statement from Major Wellington Y. Hom on April 22, 2002. Major Hom was a member of the Washington (State) Army Reserve Guard, Special Forces, and the Commander of a Team Task Force for Airport Security. Blake also noted, in response to my earlier query regarding appellant's reference to a promotion, that:

> Appellant was never promoted at any time during his one month period of employment with TSA. ... I have no explanation for why Appellant continues to refer to a non-existent promotion, and to the position he held as a Supervisory Criminal Investigator, pay band J. Such has never been the case. Appellant was hired into, and terminated from, the position of Civil Aviation Security Specialist, pay band G, the entry level for such position.

n21 Appeal I-1, file tabs 20 (unsigned version, with attachments) and 22 (signed version, no attachments).

Maj. Hom's written statement was attached to Blake's declaration. n22 Hom stated that he arrived at the FAM facility on April 22, 2002, to meet with Blake and he recognized appellant. Hom advised Blake that he "had a history regarding that individual [*9] [appellant] that was sensitive and urgent in nature." Hom explained that he and appellant had "signed into an Army Reserve Special Forces unit at approximately the same time in 1993" and they had served together in 1994-1995. Hom related that appellant had apparently misrepresented his credentials on several occasions, that appellant was ultimately released from the Washington Army National Guard, and that appellant had attempted to re-enter the military system by enlisting in the Guard in other states. Hom stated that he did not "know all the details" of the investigation and appellant's discharge because he had not had contact with appellant since 1995, but he provided the names of two individuals who were "more intimately familiar" with the details of the discharge, including appellant's commanding officer at the time and the administrative NCO who processed the discharge. Hom also stated that appellant had been terminated from employment with the Whatcom County Sheriff's Office in Washington State for misrepresenting himself as a DEA agent.

n22 Appeal I-1, file tab 20, exhibit A.

Also attached to Blake's declaration was a copy of appellant's "Report of Separation and Record [*10] of Service"

(NGB Form 22) from the Army National Guard of Washington. n23 This document reflected that appellant's separation was a "resignation, conditional ILO of elimination" and "under honorable conditions" on July 24, 1996. Under "remarks," there was an entry stating that, "soldier discharged without personal notice, resignation, conditional ILO elimination."

> n23 Appeal I-1, file tab 20, exhibit B.

In a telephonic status conference on May 27, 2003, appellant moved for a dismissal without prejudice with leave to refile after the Department of Labor (DOL) investigated his complaint. After confirmation that appellant had filed with the DOL and that the DOL was investigating, n24 I dismissed the appeal without prejudice. n25

> n24 Appeal I-1, file tabs 23-25.

> n25 Appeal I-1, file tab 26.

The DOL found "no merit" to appellant's claim n26 and on July 21, 2003, appellant refiled his appeal. n27 Appellant retained an attorney n28 who argued that, not only had ASAIC Blake discriminated against appellant, but that Blake had retaliated against appellant, either directly or by imputation, for his exercise of USERRA rights in 1996. Appellant's counsel maintained that Blake had become [*11] aware of a 1996 USERRA complaint which appellant filed after he was terminated by the Whatcom County Sheriff and Blake had terminated appellant in retaliation for it. Even if Blake did not know about appellant's 1996 complaint, Maj. Hom knew about the complaint and, as a result, had a retaliatory animus. Because Blake relied almost entirely on Hom's statement in taking the action, Hom's animus was imputed to Blake. n29

> n26 Appeal I-1, file tabs 27-28.

> n27 Appeal I-2, file tab 1.

> n28 Appeal I-2, file tab 3.

> n29 Appeal I-2, file tab 5 ("Summary of Telephonic Status Conference").

A hearing was conducted on March 2-3, 2004, in Seattle. Appellant called all the witnesses at the hearing, including ASAIC William Blake and Maj. Wellington Hom. The representatives made oral closing arguments at the conclusion of the hearing.

USERRA law applicable

*Section 4311, title 5, United States Code*, provides, in pertinent part that:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, [*12] promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

> (b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this

chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

Thus, § 4311(a) prohibits discrimination based on, *inter alia,* prior military service or the obligation for future military service. Section 4311(b) prohibits retaliation for, *inter alia,* exercising one's rights under USERRA.

In order to prevail in a USERRA case, an appellant must prove by preponderant evidence that his military status or obligations were a motivating factor [*13] for the denial of a benefit of employment. In that event, an appellant will prevail unless the agency can prove that the action would have been taken in the absence of the military status or obligations. *38 U.S.C. § 4311(c); see, e.g., Sheehan v. Department of the Navy, 240 F.3d 1009, 1013-14 (Fed. Cir. 2001); Fox v. U.S. Postal Service, 88 M.S.P.R. 381, 385 (2001).*

Circumstantial evidence is often a factor in USERRA cases because discrimination is seldom open or notorious. Discriminatory motivation under the USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. In determining whether the employee has proven that his protected status was part of the motivation [*14] for the agency's conduct, all record evidence may be considered, including the agency's explanation for the actions taken. *See Sheehan, 240 F3d at 1014.*

A USERRA appeal is confined to a determination whether the agency actions were motivated by discrimination due to his prior military service. *See Metzenbaum v. Department of Justice, 89 M.S.P.R. 285, 291-292 (2001)* (in a USERRA appeal, an appellant is claiming that the agency violated a specific law designed to protect him against discrimination based on prior military service, not that he was the subject of a particular improper action; Board may not review the merits of the underlying action), *on remand from, 240 F.3d 1068 (Fed. Cir. 2001).*

Other forms of discrimination, or other alleged improprieties, may not be considered, except to the extent they might bear on the issue of discrimination due to prior military service. *See, e.g., Bagunas v. U.S. Postal Service, 92 M.S.P.R. 5, 13 (2002)* (claim of discrimination based on a disability alone, even a disability arising out of military service, is not cognizable [*15] under USERRA); *Metzenbaum, 89 M.S.P.R. at 291-292* (in a USERRA appeal, Board may not adjudicate claims of discrimination based on grounds other than military service or alleged retaliation); *McAfee v. Social Security Administration, 88 M.S.P.R. 4, 6 and 9-10 (2001)* (Board remanded the case to the administrative judge for consideration of appellant's possible USERRA claim but noted that USERRA does not allow the Board to adjudicate appellant's claims of discrimination based on sex and disability or allegations of violation of the merit systems principles); *Bodus v. Department of Air Force, 82 M.S.P.R. 508, 514-517 (1999)* (in a "pure USERRA case," the Board may not adjudicate claims of denial of due process, age discrimination, or impropriety on other grounds); *McBride v. U.S. Postal Service, 78 M.S.P.R. 411, 415 (1998)* (USERRA proscribes, *inter alia,* the denial of an employment benefit based on performance of military duty, not its denial based on a disability arising from that duty).

Facts of the dispute

The vacancy announcement to which appellant responded [*16] was issued in September 2001. n30 Appellant testified he heard about the FAM position in October or November 2001.

n30 Appeal I-1, file tab 4, agency subtab 4l; file tab 9, attachment to appellant's submission.

Appellant testified that in December 2001, before he completed his application, he contacted his Army Career Manager in St. Louis to determine his security status. n31 His Career Manager referred him to the military command's

security section. Appellant testified he was advised that his security clearance had been "cancelled" in 1996 or 1998, but there was no record of a revocation or suspension.

n31 Appellant's reply to notice of proposed proposed termination.

On January 17, 2002, the agency issued a "Notice of Results" and a "Qualifications Summary" for the appellant. n32 The "Notice" reflected that appellant was "tentatively eligible" to be a FAM at grade levels FV-G, FV-H, and FV-I.

n32 Appeal I-1, file tab 6, attachments to appellant's submission.

On February 11, 2002, appellant completed his Standard Form 86 "Questionnaire for National Security Positions." n33 In response to item # 22, entitled "Your Employment Record," appellant acknowledged that in February [*17] 1996, he had been fired and/or "left a job for other reasons under unfavorable circumstances," listed his employer as Whatcom County, Washington, and stated the reason was "military leave." In response to item # 26, "Your Investigations Record," appellant indicated, at item 26b, that he had never had his security clearance or access denied, suspended, or revoked.

n33 Appeal I-1, file tab 4, agency subtab 4k.

Appellant testified that he reported to the FAM facility in Atlantic City, New Jersey, for an "assessment" which took 3-4 days. During that assessment, he went over his SF-86 "block by block" with an investigator, according to appellant.

Appellant testified that "four to five weeks later," he heard he was successful in the assessment and he was offered a job. The record contains a letter dated March 7, 2002, advising appellant that he had been selected for the position and that he should report on April 7, 2002. n34 Appellant accepted by signing the letter on March 8, 2002.

n34 Appeal I-1, file tab 4, agency subtab 4j.

The week of April 7-12, 2002, appellant attended training (or "in-processing," as it was also called) at the FAM facility in Atlantic City. Carolyn Donohue, [*18] a Personnel Management Specialist working on the in-processing in 2002, testified that appellant's travel vouchers showed that appellant was in Atlantic City from April 7 through 12. Appellant testified he "had no reason to doubt" that he was in Atlantic City from April 7 through 12, 2002.

There was no documentary evidence to establish appellant's whereabouts the week after that. It was, however, standard operating procedure for FAM's to be sent home for one week after training to get their personal affairs in order before reporting to their assigned duty station. n35

n35 Testimony of Carolyn Donohue and William Blake.

Appellant testified that he did, in fact, return to his home in Canada for a "couple of days" after his in-processing. Appellant maintained, however, that on Monday, April 15, 2002, he called the FAM office to come down and see the office and visit the area. Either "that day or a day or two after," appellant arrived at the FAM office.

According to appellant, upon his arrival at the FAM office, he introduced himself to the secretarial staff and some other FAM's, went out and came back, and then met with Blake. No one else was in the meeting except him and Blake. [*19] Blake gave him a "welcome aboard" speech and they made "small talk." According to appellant, "one of them mentioned promotional opportunities" and Blake gave him a vacancy announcement for Supervisory Civil Aviation

2004 MSPB LEXIS 1344, *19

Specialist (Assistant to the SAIC). According to appellant, Blake left the office to get the announcement. The announcement had some markings on it which Blake had made. n36 Appellant testified that he "thought it was strange that Blake would offer him a promotion as a brand new FAM," but Blake told him, "if you don't want it, there are 30-40 other guys in the back who will take it." According to appellant, Blake told him the specific matters to include on his resume/application.

      n36 A copy of this vacancy announcement is found in the file for appeal I-2, tab 24, appellant's exhibit H. The "markings" are a few circles, some underlines, and the hand-written word "Seattle" in parentheses.

   Appellant testified that he returned to Canada and prepared a resume which he faxed on April 17, 2002. A secretarial service prepared appellant's resume. n37

      n37 Copies of appellant's resume with the facsimile cover memo are found in the file for appeal I-2, tabs 24 (appellant's exhibits I-J) and 25 (appellant's exhibits 8-9).
[*20]

   Appellant testified that he returned to Seattle and reported for orientation on Monday, April 22, 2002. On either April 22 or 23, an agent told him that Blake wanted to see him. According to appellant, Blake told him that "information has come up in your background" and Blake asked about his reserve status and termination from Whatcom County. Appellant told Blake about his reserve status. He also told Blake that he had been terminated by Whatcom County, that he felt the termination was unjust, that he had gone to USERRA, and the USERRA investigator agreed. According to appellant, Blake said "nothing."

   Appellant testified that Blake gave him a memorandum relieving him of his duties, but said "don't worry," this is "pretty standard," "it happens all the time," and there is "sometimes there is just a little hiccup when backgrounds are being done." The memorandum, dated Wednesday, April 23, 2002, placed appellant on administrative suspension, with pay, pending the results of a background investigation required for his security clearance. It also required that appellant surrender his firearm and credentials. n38 According to appellant, he went to look for apartments in the area with Adrian [*21] Corzine, another FAM, after receiving the letter of suspension.

      n38 Appeal I-2, file tab 24, appellant's exhibit G.

   Appellant testified that the next morning (Thursday, April 24), he retrieved a message on his cell phone from Blake telling him that he had the promotion to the supervisory position and that he should see Blake when he got into the office. When he arrived at the office, according to appellant, Blake reiterated that he had the promotion and he gave appellant a tour of his new office. Appellant thought that this was all "really weird because I was a new FAM and I had the hiccup pending in my background."

   Blake told appellant, however, he wanted appellant to continue to work on his resume because it "needed some corrections." Appellant told Blake that the computer disk containing his resume was in Canada, and Blake told him go to Canada and correct it. According to appellant, he returned to Canada, had the secretarial service type the corrections, and returned his resume by facsimile on Thursday, April 24, 2002. n39

      n39 Appellant submitted photocopies of facsimile cover sheets dated April 24, 2002, and an invoice from White Rock Office Services dated "April 02" which, he maintained, documented his correction to, and transmission of, his resume at Blake's bidding. (Appeal I-2, file tab 24, appellant's exhibit M). Appellant testified that he "did not recall" why he fax'd these items to two different numbers.
[*22]

2004 MSPB LEXIS 1344, *22

Appellant testified that "later in the day, someone called from FAM and said Blake wants to see you right away about the promotion." Appellant advised that he could not be there until the next day. Early the next morning on Friday, April 25, Blake gave him the notice of proposed termination. n40 According to appellant, Blake explained the charges, but never mentioned Major Hom. Appellant told Blake, "you're getting bad information," and Blake said, "write it up," according to appellant. Appellant was given only five calendar days, until Tuesday, April 29, 2002, to submit his written response.

> n40 The circumstances of the preparation of the notice of proposed termination were unclear. Blake testified that he talked with either Donna Bentley or Carolyn Donohue in Human Relations and that Human Relations prepared the notice for him. Donohue testified that Bentley did not start with the FAM Service until May 19, 2002, and that she did not get involved until after Blake had sent her a copy of the notice by facsimile on April 24, 2002, at 4:09 p.m.

Appellant testified that, on Friday, April 25, 2002, he telephoned Angie Watkins, a Security Specialist at the Army Human Resources Command [*23] in St. Louis, and she advised him there was no record of his security clearance being revoked or suspended. Angie Watkins testified that she advised appellant on April 25 that his security clearance had been cancelled in 1998, after an adjudication was not completed due to loss of jurisdiction. Watkins further testified that, according to her records, appellant had never had a security clearance.

Appellant submitted his response to Blake on April 29. Appellant attached several documents to his response. n41 Those documents were as follows. First was appellant's November 14, 1995, letter to the Washington Army National Guard (WARG) requesting his "immediate release" from the Guard "based on conflicts arising with my civilian employer over military leave for training and drills." Appellant also noted in this letter that "I understand that an AR 15-6 investigation regarding my attendance at a military school has been initiated." Second was the NGB-22 Form, "Report of Separation and Record of Service," which indicated that, effective July 24, 1996, appellant was "discharged without personal notice, resignation, conditional ILO elimination" and that the character of appellant's service [*24] had been "under honorable conditions." The third document was one page of a multi-page form which appellant claimed verified his reenlistment in the WARG on January 23, 1997. The fourth document was a copy of an order for appellant to report to Fort Campbell, Kentucky, for 12 days of active-duty training starting February 11, 2002, which appellant submitted to show his then-current status. The fifth document was one page of a multi-page DD Form 1996/3, stating that the "type of discharge will not be entered on NGB 22 for warrant or commissioned officers unless there derogatory information." The sixth document was a DD Form 214 "Certificate of Release from Active Duty" indicating that, effective March 15, 2002, appellant had been released from active-duty training upon completion and that the character of his service was "honorable." The seventh document was a December 22, 1999, letter from attorney Lloyd D. Oaks to another attorney wherein Oaks explained that he represented appellant in his "appeal of two United States Army Reserve/National Guard personnel issues," his view that military records are unreliable generally, and his view that appellant's military record erroneously contained [*25] negative information. The final document appellant submitted was an August 18, 1997, letter from Department of Labor Senior Investigator, Karen M. Marin, wherein she advises appellant that his USERRA complaint had been "found to have supported prima-facie showing that your rights under the law have been violated by your former employer." Ms. Marin concludes her letter by stating "please feel free to share this information with your employer/prospective employer." This letter provides no particulars regarding the nature of appellant's complaint, the identity of the employer, or any other particulars.

> n41 Appeal I-1, file tab 1, attachments to appellant's April 29, 2002, reply, which is attached to appellant's "Appeal Form."

On the late evening of May 2, 2002, Blake e-mailed Carolyn Donohue and advised, in pertinent part, that:

> ... I am accountable for ensuring that the office, personnel within the office, and rated equipment

2004 MSPB LEXIS 1344, *25

function to maintain operations "Security." Given this responsibility, I must therefore be without doubt, question, or harbor any reservation in regard to the "Integrity" of these three elements. I have studied and considered KURSAR's rebuttal to the charge [*26] ... I have, additionally, considered the compelling affidavit of Major Wellington Hom and other information concerning KURSAR which provide contrast. Observing the grave importance of maintaining operations, security, professional integrity, and office comradery; I, therefore, recommend that Robert A. KURSAR be removed from the Federal Air Marshal Service - as I have reservations of his integrity, and ability to represent this office or the agency appropriately. n42

   n42 Appeal I-2, file tab 26, agency exhibit 8.

   By e-mail early on the morning of May 3, 2002, Greg Mclaughlin, the FAM Director, concurred with the recommendation. n43 By letter dated May 3, 2002, Blake found both charges were sustained and terminated appellant, effective May 8, 2002. n44

   n43 Appeal I-2, file tab 26, agency exhibit 8.

   n44 Appeal I-1, file tab 4, agency subtab 4f.

   The agency's version of the commencement of appellant's employment -- primarily provided by William Blake -- was different in crucial respects. Blake testified that he first met appellant on the afternoon of Monday, April 22, 2002. According to Blake, appellant reported with two other new FAM's, Adrian Corzine and Gabriel Abaglo. [*27] One of the three FAM's had a personal matter to attend to in the morning, so the first-line supervisor, Craig Weinstein, had told all three to report in the afternoon. In Weinstein's absence, Mike Davidson, escorted the three FAM's in and introduced them to Blake. n45

   n45 Blake testified in a deposition that Weinstein escorted appellant and the other two FAM's into him on April 22. At the hearing, he testified that he had assumed Weinstein had been the escort, but, after checking his records, he realized that Weinstein had been out of the office from April 5 or 6 to April 25.

   Blake testified that he met with Major Hom at 12:30 p.m. that same day, before he ever met appellant. Thereafter, he gave his "welcome aboard" speech to all three men, including appellant. Despite the negative information from Hom, Blake planned to start appellant through training. Then he realized that appellant would be receiving confidential classified information, so, on April 23, he confiscated appellant's three-ring binder and put appellant on administrative suspension.

   Blake testified that he did not meet with appellant the week before April 22 and he did not encourage appellant to apply for a promotion. [*28] Blake noted that he would not have invited appellant to apply for the supervisory vacancy because it was a "J band" position, i.e., it was three bands above appellant's G-band level as a new FAM. Blake testified that he had been with the FAA for 20 years and he was only at the J-band level. Blake was not aware of any employee who had been promoted from a G band to a J band.

   Blake testified that the markings on the supervisory vacancy announcement were his, but that he did not give it to appellant. He noted that appellant could have gotten the announcement from either of two bulletin boards where it was posted, one in the squad room and one in the break area. Blake also maintained that he did not assist, and would not have assisted, appellant with his application. Finally, Blake testified that, if appellant faxed an application on April 17, he was not aware of it and it was before he had met with appellant.

2004 MSPB LEXIS 1344, *28

Discussion and findings

Appellant's argument, as I understand it, is as follows. Blake had no valid basis to terminate him. Therefore, there must have been some other reason for the termination. That other reason was discrimination based on his reserve status/obligation and/or [*29] retaliation because of his prior USERRA complaint. Blake learned of appellant's reserve status and his prior USERRA complaint during the week of April 15-20, 2002, when appellant came to the FAM office before his reporting date, and on April 22, 2002, when Major Hom made his allegations. Even if Blake didn't have the requisite knowledge or motive, Major Hom did, and, because Blake relied entirely on the information provided by Hom, Hom's knowledge and/or animus is imputed to Blake.

I do not find any evidence of discrimination based on military status or retaliation for prior USERRA activity. Regarding the validity of the charges, I agree with appellant that an adverse action most likely could not be sustained based on the charges brought and the evidence adduced. There was no evidence to support either the charge that appellant failed to state that he had been terminated from the Washington State Army/Air National Guard or the charge that appellant falsely stated that he had never had a security clearance revoked or suspended. Blake acknowledged this during his testimony at the hearing.

In my view, appellant is correct that Blake based his action entirely on the allegations contained [*30] in Major Hom's declaration. Although Blake attempted to translate Hom's allegations into something more clear-cut and serious for the purpose of the formal termination action, i.e., falsification of an application, it appears to me that this was merely for appearances. In reality, Blake was concerned about appellant as a result of Hom's allegations, Blake knew appellant was a probationary or trial employee who had very limited appeal rights, and Blake was not really interested in taking the time and effort to determine the accuracy of Hom's allegations. Blake merely decided to err on the side of caution with the least effort necessary. The following testimony, which commences with a question by appellant's representative as to how Blake interpreted appellant's NGB-22 form (which, at the time, Blake thought was a DD-214 form), sums up Blake's reasoning.

> Blake: In our line of work, it's very important that you be able to trust the individuals that you work with. It's very important that the integrity of individuals be above board and not questionable. When I'm looking at this form, although I may not know what it says, my gut feeling tells me that the remarks in 18 supports what [*31] Hom had shared with me.

> Question: But you didn't investigate, is that correct?

> Blake: That's true, I did not.

> ****

> Question: Mr. Kursar explains in here [appellant's response to the proposed termination] about a problem he ran into with his former employer, Whatcom County, is that correct?

> Blake: I don't know, I'll take your word for it.

> Question: You didn't read it?

> Blake: I didn't read that, no sir.

> Question: So, all you did was glance at the DD-214, you decided it supported what Hom said, and based on that, you just decided you had to terminate him, is that right?

> Blake: I glanced at the document, what I thought was the DD-214, now I know it's the NGB-22,

2004 MSPB LEXIS 1344, *31

specifically block 18. In addition to what Hom had shared with me, and the fact that he was on probation, I made a decision this isn't something I should be dealing with at this point because we're building an agency, it's being built on integrity, it's being built on trustworthiness, and if I'm not comfortable with this individual, I can use the tool that the system has given me which is during the probationary period to terminate someone. I made that decision.

Question: As you sit here today though, you can't [*32] identify any specific false statements that Bob Kursar ever gave you, can you?

Blake: No sir, I can not.

Question: And as you sit here today, we've looked at all this documentation, you can't see any documentation that shows that there's any false statements Mr. Kursar made, isn't that true?

Blake: Not that I understand. These documents could very well do that, but I don't understand enough to [trails off].

I find that Blake received disturbing information from a source whom he believed was credible, he did not want to take the time to determine with precision the accuracy of the information, and he took what he thought was the path of least resistance, i.e., he terminated a probationary employee. I do not find any reason to believe that Blake's actual motivation was appellant's military status or prior USERRA activity.

Mr. Blake testified that he did not terminate appellant because he was a reservist and, at the time he caused the notice of proposed termination to be issued, he did not know that appellant had engaged in prior USERRA activity, indeed, he did not even know what USERRA was at that time. There was no credible evidence to contradict his assertions and there were [*33] several reasons to believe them.

First, the melieu out of which the case arose must be remembered. It is logical to assume that many FAM's would be former military members and/or reservists. And, indeed, Mr. Blake, in his May 22, 2003, declaration, stated that he himself is a former member of the United States Marine Corps; there were "several reservists" working for the Seattle Field Office during the time appellant was employed; and, at the time of his declaration, there were 12 reservists working at the Seattle Field Office, 6 of which were serving on active duty. n46 Neither party explored this evidence further at the hearing.

n46 Appeal I-1, file tabs 20 and 22.

Second, I note that appellant did not even come up with his USERRA claim until 11 months after he had been terminated. Moreover, he did not claim a USERRA violation when he filed his appeal or in his next two submissions to the Board. n47 It was over a month into his first appeal n48, and after he had been advised that the Board did not have jurisdiction over his appeal on various other grounds, n49 that he first came up with his USERRA claim. n50 Appellant's delay in raising his USERRA claim undermines its credibility. [*34] *See Abatecola v. Veterans Administration, 29 M.S.P.R. 601, 607 n.3 (1986), aff'd, 802 F.2d 471 (Fed. Cir. 1986)* (Table) (delay in raising a defense undermines its credibility), *citing Nash v. Office of Personnel Management, 26 M.S.P.R. 700, 704 (1985).* This is especially true where, as in this case, it appears to me that appellant raised his factual allegations for the express purpose of finding a way to establish the Board's jurisdiction.

n47 Appeal I-1, file tabs 1, 6, and 9.

n48 Appeal I-1, file tab 11 (appellant's response, dated April 8, 2003).

2004 MSPB LEXIS 1344, *34

n49 Appeal I-1, file tabs 2, 4, 5, and 8.

n50 Appeal I-1, file tab 11. Appellant was terminated effective May 8, 2002; he filed his appeal with the Board on March 3, 2003; and he first raised his USERRA claim by submission dated April 8, 2003.

Appellant was in the Army reserves and he did, apparently, file a USERRA complaint in 1996. The record does not include appellant's actual complaint. The record does contain a March 14, 1996, letter from a DOL representative to the Whatcom County Sheriff detailing appellant's allegations and [*35] requesting a response. n51 There is also the August 18, 1997, letter from DOL investigator Karen Marin to appellant acknowledging he filed a complaint, advising that there was a "prima-facie showing" that his rights had been violated, and noting that appellant should "feel free to share this information" with his employer or a prospective employer. n52 There is no evidence in the record what, if anything, resulted from this finding.

n51 Appeal I-2, file tab 26, attachment to agency exhibit 7.

n52 Appeal I-2, file tab 21, appellant's exhibit C.

Although the evidence does establish that appellant was a reserve and had filed a USERRA complaint, there is no probative evidence to establish that Blake had knowledge of these facts before he met with Hom on April 22, 2002. It was only after meeting with Hom that Blake knew appellant had been in the reserves. There is no evidence that Hom knew about appellant's prior USERRA complaint. Appellant strove to ascribe such knowledge to Blake -- that was apparently the purpose of his claim that he met with Blake during the week of April 15-20, 2002, before he was to report for duty -- but I did not find appellant's efforts convincing. Appellant [*36] presented no actual corroboration for this visit with Blake, even though he claims to have arranged it ahead of time by telephone.

I found incredible appellant's attempt to lend veracity to his early-contact claim by asserting that Blake encouraged him to apply for a three-grade promotion before he had even started work as an entry-level FAM. Appellant may have visited the Seattle FAM Office the week before he actually reported, he may have seen the vacancy announcement and acquired a copy, and he apparently did put in his application. I do not, however, believe that he met with Blake or that Blake discussed promotion with appellant or encouraged appellant to apply for a promotion.

I find it incredible that Blake would, upon meeting appellant or any other new FAM for that matter, encourage that new FAM to apply for a promotion to a supervisory position three levels above his or her present level. Moreover, appellant was not content with merely alleging that Blake encouraged him to apply. Appellant claimed, at various times, that Blake filed his application for him, n53 that Blake advised him he had the promotion, and that he had actually started performing the supervisory duties of [*37] the position.

n53 In appellant's deposition on October 23, 2003, he testified that Blake submitted his first application "on his behalf" and that Blake told him that he had Federal Expressed the application. (Appeal I-2, file tab 26, agency exhibit 10, pages 107-108).

In his "Appeal Form," at blocks # 12 and # 14, appellant states that he was a "Supervisory Criminal Investigator." n54 In his May 5, 2003, submission regarding jurisdiction, appellant explained:

... SAC interviewed me shortly after arriving in the Seattle Field Division. ... The following day I was asked if I would be interested in a supervisory position. The Seattle base was in its infancy stages as the Marshal's service was just expanding and there were limited personnel assigned to the station, much less supervisory personnel. I was asked to complete a resume and forward it to human resources, which I did. ... I was notified that I received the promotion and began performance at the higher grade. My supervisor did inform me that due to the circumstances of the transformation of the TSA and the exigent nature of

getting this expanding new program in operation, he possessed authorization as an appointing [*38] official, and as the Special Agent in Charge of the Seattle Division had the authority to promote within the Division. Other employees in the Field Division were aware of my promotion. n55 [emphasis supplied].

> n54 Appeal I-1, file tab 1.

> n55 Appeal I-1, file tab 14, appellant's response, page 2, paragraph 5.

I find it highly unlikely that Blake would have told appellant, on or about September 22-25, 2002, that he had the promotion. For one thing, the vacancy announcement indicates that the period for applications did not even close until September 30, 2002. Blake testified that he had no authority to select or hire for the position; no evidence to the contrary was presented. It also is difficult to imagine how appellant could have "began performance at the higher grade" when he officially reported for duty around 1:30 on September 22 to begin training and he was placed on administrative suspension without duties on September 23. Finally, there was no evidence presented to support appellant's claim that "other employees in the Field Division were aware of my promotion."

Turning to the evidence provided by Major Hom, there is no evidence that Hom told Blake that appellant [*39] was a reservist in April of 2002 or that Hom told Blake that appellant had filed a USERRA complaint in 1996. Hom's written statement primarily addresses Hom's personal experience with appellant in an Army Reserve Special Forces unit on and off from 1993 through 1995 and some second-hand knowledge Hom had regarding appellant's tenure as both a reservist and an employee with the Whatcom County Sheriff's office. What Hom provided Blake was not information regarding appellant's present reserve status or prior USERRA activity, but Hom's own concerns about appellant's past, i.e., appellant's alleged tendency to misrepresent his qualifications and experience and appellant's discharges from the National Guard and the Sheriff's office. In his statement, Hom mainly raises questions about appellant and he "strongly recommends" that Blake contact Larry Gibson, appellant's former "administrative NCO," for more information. n56 As it turned out, Blake did not contact Gibson or anyone else, preferring rather to go with his "gut feeling" and to summarily terminate an employee on probation.

> n56 Appeal I-1, file tab 20, agency exhibit A.

It is true that knowledge and animus may be imputed. *See,* [*40] *e.g., Russell v. Department of Justice, 76 M.S.P.R. 317, 323 (1997)* (even if the deciding official did not actual knowledge of appellant's protected disclosures, knowledge was imputed to him by virtue of the fact that he was influenced by an official who did have knowledge). In the instant case, however, there is no evidence whatsoever to conclude that Hom had animus toward appellant because of appellant's reserve status or that Hom knew that appellant had filed a USERRA complaint in 1996. Thus, there is no basis to "impute" USERRA-related animus or retaliatory intent to Blake via Hom.

Appellant also undercut his own claim of imputed animus based on military status/USERRA activity by ascribing, directly or through his representative's questions, different motives to Hom. Appellant's representative elicited from Hom an acknowledgment that Hom had visited Blake on April 22 because he was interested in possible employment with the FAM Service. Counsel suggested that Hom wanted to discredit appellant because he thought that appellant would try to discredit him. Counsel also suggested that Hom had animus toward appellant because appellant had replaced Hom for [*41] one day during a training exercise in Thailand after Hom had a disagreement with another Major who was in charge of the operation. Finally, counsel suggested that Hom was trying to get back at appellant on behalf of Larry Gibson because Hom was a good friend of Gibson's and Gibson was angry with appellant for two reasons: 1) appellant had broken off a long-term relationship with Gibson's step-daughter, and 2) Gibson had been reprimanded for his part in allowing appellant to attend military training as a law enforcement officer. n57 In my view, there was no probative evidence to suggest there was validity to any of these suggestions. Even if there had been,

however, such personal motives do not equate to discrimination/retaliation based on military status/USERRA activity. *See, e.g., Daniels v. U.S. Postal Service, 88 M.S.P.R. 630 (2001), aff'd, 25 Fed. Appx. 970* (Fed. Cir. Dec. 10, 2001) (No. 01-3313) (appellant did not state a claim under USERRA where he claimed that the agency's animus was directed at him personally for something that happened during his military service, rather than claiming that agency treated persons [*42] who performed military service differently than those who did not). Moreover, the fact that these claims were raised is a further indication that military status/USERRA activity was not what was really involved in this case.

   n57 These two matters were not addressed in great detail at the hearing. They were explored during appellant's deposition on October 21, 2003, however. (Appeal I-2, file tab 26, agency exhibit 10, transcript of deposition). As to the first, appellant testified that he had been in a relationship with Gibson's step-daughter, Christine Zenker, from 1994 to December 2001, when he broke off their engagement and later sued her for "breach of constructive trust and unjust enrichment" because she sold a house on land in which appellant claimed an ownership interest. (Deposition transcript, pages 11-27). The second matter involved appellant's attendance at a 1995 military training school in Florida which, according to appellant, the Whatcom County Sheriff had ordered him not to attend on military leave. According to appellant, he arranged to attend as a law enforcement officer on annual leave and, thus, he was not occupying a "military slot" at the school nor was he using military leave. According to appellant, the Sheriff found out and called the school, the school released him, and he was subjected to an internal investigation by the Washington National Guard. As a result of this investigation, Mr. Gibson was reprimanded for his part in facilitating the arrangement for appellant to attend the school. (Deposition transcript, pages 27-35).
[*43]
Conclusion

   Appellant was understandably upset that he was terminated from employment, especially where the formal charges were not supported and did not reflect the true reasons for his termination. Appellant sought redress from the Board, determined that his only avenue of jurisdiction was via USERRA, and attempted to conform the facts of his case to this narrow and specialized avenue of jurisdiction. His effort was unavailing. Appellant presented no direct or circumstantial evidence of discrimination or retaliation relating to his status as a reservist or his prior USERRA activity. What the evidence established was that a colleague and acquaintance of appellant's conveyed information to appellant's supervisor at the commencement of appellant's probationary period and the supervisor went with his gut feeling to terminate appellant rather than attempting to sort out the accuracy of the information. n58 The basis for appellant's termination may have been arbitrary and erroneous. It may have been based on personal animus or animus toward appellant because of appellant's actions. It was not, however, based on discrimination due to his reserve status or retaliation for his prior [*44] USERRA complaint.

   n58 I note that, with the benefit of hindsight, Blake's "gut feeling" was somewhat prescient. As this decision illustrates, appellant did have, for whatever reason, an unfortunate history of becoming involved in situations which raised questions and required explanations. I refer to matters such as appellant's 1995 release from the Washington National Guard, his 1996 termination from the Whatcom County Sheriff's office, his unsuccessful 1997 attempt to re-enter the National Guard in California (appeal I-2, file tab 22, appellant's exhibit B, and tab 21, agency exhibits 2, 3, 4, and 5), and whatever the matters were which resulted in attorney Oaks writing to an attorney for appellant in 1999 (appeal I-1, file tab 1, attachment to "Appeal Form"). In regard to one of appellant's alleged misrepresentations, i.e., wearing a Ranger tab to which he was not entitled, appellant testified that he "had been told both that he was authorized and he was not authorized to wear it," and that he "was entitled to it at one point, but was later told that there was insufficient documentation" for him to wear it. Finally, appellant acknowledged that his resume entry indicating that he was employed by the United States Department of Justice, Drug Enforcement Administration, from 1993 through 1996 (appeal I-2, appellant's exhibit 8, page 2), did not "match up" with his SF-86 (appeal I-1, file tab 4, agency subtab 4k, page 4) which indicated he was employed by Whatcom County from 1992 through 1996. Appellant testified that, since he was

2004 MSPB LEXIS 1344, *44

part of a DEA task force, he was "confused" as to his employer actually was.
[*45]

A USERRA appeal is confined to a determination whether the agency actions were motivated by discrimination due to his prior military service. *See Metzenbaum, 89 M.S.P.R. at 291-292* (in a USERRA appeal, an appellant is claiming that the agency violated a specific law designed to protect him against discrimination based on prior military service, not that he was the subject of a particular improper action; Board may not review the merits of the underlying action).

There is not necessarily a remedy for every wrong. *See, e.g., Smith v. Department of the Navy, 4 M.S.P.R. 20 (1980)* (summary removal of a Veterans Readjustment Act appointee removed during his first year of employment not cognizable by the Board in the absence of a specific law, rule or regulation, despite false and stigmatizing accusations and the absence of due process). Appellant has no basis for a remedy from the Board in this case.

## DECISION

Appellant's request for relief pursuant to USERRA is DENIED.

FOR THE BOARD:

John W. Tapp

Administrative Judge

### NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is [*46] set forth below, is the last day that the administrative judge may vacate the initial decision in order to accept a settlement agreement into the record. *See 5 C.F.R. § 1201.112(a)(5).*

### NOTICE TO APPELLANT

This initial decision will become final on **September 30, 2004,** unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if this initial decision is received by you more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

### BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with [*47] supporting evidence and argument, must be filed with:

The Clerk of the Board

Merit Systems Protection Board

1615 M Street, NW.,

Washington, DC 20419

2004 MSPB LEXIS 1344, *47

A petition for review may be filed by mail, facsimile (fax), or personal or commercial delivery. A petition for review may also be filed by electronic mail (e-mail) if the petitioning party makes an election under 5 C.F.R. § 1201.5(f), which requires a written statement of the election that includes the e-mail address at which the party agrees to receive service. Such an election may be filed by e-mail at the following address: e-FilingHQ@mspb.gov.

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. The date of filing by mail is determined by the postmark date. The date of filing by fax or e-mail is the date of submission. [*48] The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. If the petition is filed by e-mail, and the other party has elected e-Filing, including the party in the address portion of the e-mail constitutes a certificate of service.

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals for the Federal Circuit

717 Madison Place, NW.

Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## Legal Topics:

For related research and practice materials, see the following legal topics:
Criminal Law & ProcedureAppealsReviewabilityTime LimitationsGovernmentsFederal GovernmentDomestic SecurityGovernmentsFederal GovernmentEmployees & Officials

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

# EXHIBIT E



**U.S. Department of Transportation**
**Transportation Security Administration**

Federal Air Marshal Service
Seattle Field Office, ACT-700N
600 Powell Avenue SW
Renton, Washington 98055

May 3, 2002

Mr. Robert Kursar
#17 2345 Cranley Drive
Surrey, B.C.  V4A9G5

Dear Mr. Kursar:

By letter dated April 25, 2002, I issued a notice proposing your removal during your probationary period.  The proposal was issued because you submitted an official document that contained false and/or misleading information.

I have carefully considered your written response to the charges dated April 29, 2002.  I have determined that the facts support the proposed action.  I have decided that it will promote the efficiency of the service to terminate you from government employment. This termination action will be effective the close of business on May 8, 2002.

You may appeal this decision to the Merit Systems Protection Board (MSPB) if you believe this action is being taken as a result of discrimination because of marital status or political reasons, or based on conditions arising before your appointment and you allege that the action is procedurally improper.

Your appeal must be filed any time during the period beginning with the day after the effective date of this action or the date of this letter whichever is later and ending 30 calendar days after the later date.  An appeal must be submitted to the Merit Systems Protection Board, Northeast Regional Office, U.S. Customhouse Room 501, Philadelphia, PA 19106 on the enclosed MSPB form. I also have enclosed information about MSPB regulations and procedures.  The regulations are also available on the MSPB website at www.MSPB.gov.  If you cannot access the website and would like a copy of the regulations or if you wish further information regarding this notice, you may contact Carolyn Donohue, Personnel Management Specialist, Human Resources Management Division at 609-485-9491.

An appeal based on other discriminatory reasons (race, color, religion, sex, national origin, disability, sexual orientation, age or retaliation for participation in the EEO process) must be raised with an EEO Counselor within 45 days from the effective date of this action. You may contact the Technical Center Civil Rights Staff, ACT-9, for further information at 609-485-6675.

If you were covered by Federal Employees Health Benefits Program (FEHB), you will have a temporary extension of coverage for 31 days to obtain private health insurance. Further, if you elected life insurance coverage under the Federal Employees Group Life Insurance Program (FEGLI), you will have a temporary extension of coverage for 31 days after your life insurance terminates unless you voluntarily waived or canceled your life insurance coverage. The agency will forward to you a Notice of Conversion Privilege (SF-2819), which will confirm the termination of your life insurances.

Also, enclosed you will find a Travel Voucher for the time you were in training. You should sign and send this in, in the self-addressed envelope provided.

Sincerely,

William Blake, Jr.
Special Agent In-Charge
Seattle Field Office

CC: ACT 10
    ACT 9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROBERT KURSAR | * |
|  | * |
| Plaintiff, | * |
|  | * |
| v. | Civil Action No. 07-2001 (RBW) |
|  | * |
| TRANSPORTATION SECURITY | * |
| ADMINISTRATION | * |
| et al. | * |
|  | * |
| Defendants. | * |

# EXHIBIT F

LEXSEE 157 FED. APPX. 306

**ROBERT A. KURSAR, Petitioner, v. DEPARTMENT OF TRANSPORTATION, Respondent.**

**05-3195**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*157 Fed. Appx. 306; 2005 U.S. App. LEXIS 27236*

**December 12, 2005, Decided**

**NOTICE:** [**1] THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO THE RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS FOR RULES GOVERNING CITATION TO UNPUBLISHED OR NONPRECEDENTIAL OPINIONS OR ORDERS.

**SUBSEQUENT HISTORY:** On remand at *Kursar v. DOT, 2006 MSPB LEXIS 3037 (2006)*

**PRIOR HISTORY:** *Kursar v. Dep't of Transp., 2005 MSPB LEXIS 1526 (2005)*

**JUDGES:** Before RADER, BRYSON, and GAJARSA, Circuit Judges.

**OPINION**

[*307] PER CURIAM.

DECISION

Robert A. Kursar appeals from a decision of the Merit Systems Protection Board, No. SE-315H-03-0187-I-2, holding that his termination from the Transportation Security Administration ("TSA") did not violate the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). In his petition for review to the full Board, Mr. Kursar proffered certain evidence that he contended was new and material. The Board summarily denied his petition. Because the record is insufficient to support a conclusion that the proffered evidence was not new and material, we *vacate* the Board's order and *remand* the case to the Board for

further consideration of that issue.

BACKGROUND

On April 7, 2002, Mr. Kursar was selected for an excepted service position with the TSA as a Federal Air Marshal. His appointment was subject to a one-year trial period. Mr. Kursar [**2] reported to his assigned field office in Seattle on April 22, 2002. On April 23, Mr. Kursar's supervisor, Special Agent In Charge William Blake, Jr., informed Mr. Kursar that there were some questions regarding Mr. Kursar's employment application, and that he would be placed on administrative suspension pending further background investigation. On April 25, Mr. Blake gave Mr. Kursar written notice of his intention to terminate Mr. Kursar because of false or incorrect information on his employment [*308] application. Mr. Kursar submitted a written response to the proposed termination on April 29. After considering that response, Mr. Blake terminated Mr. Kursar on May 3, 2002.

The present dispute stems from a conversation that Mr. Blake had with Major Wellington Y. Hom on April 22, 2002, the day before Mr. Blake put Mr. Kursar on administrative suspension. Major Hom served with Mr. Kursar in an Army Reserve unit in 1994 and 1995. On April 22, Major Hom was in the Seattle field office for a meeting with Mr. Blake. While he was there, Major Hom recognized Mr. Kursar and told Mr. Blake that Mr. Kursar had had employment problems in the past. The contents of that conversation are critical to the [**3] present dispute.

Mr. Kursar contends that Major Hom had a grudge against him based, in part, on a USERRA claim that Mr.

157 Fed. Appx. 306, *308; 2005 U.S. App. LEXIS 27236, **3

Kursar had filed against the Whatcom County Sheriff's office in 1996, a claim that apparently led to reprimands for some of Major Hom's friends who worked at the sheriff's office. In his appeal to the MSPB, Mr. Kursar asserted that Major Hom told Mr. Blake that Mr. Kursar would not hesitate to file similar complaints against law enforcement agencies such as the TSA. Although it is unclear from the record how Mr. Kursar reached that conclusion as to what Major Hom and Mr. Blake discussed in their April 22 conversation, he contended that in light of that conversation, his termination must have been based on his 1996 USERRA claim and/or his status as an Army reservist.

Mr. Blake and Major Hom presented a different version of their April 22 conversation. They claimed that the conversation focused on Mr. Kursar's history of lying on employment applications, and they further claimed that, as of April 22, neither Mr. Blake nor Major Hom even knew about Mr. Kursar's 1996 USERRA claim.

Mr. Kursar appealed his termination to the MSPB in March of 2003. The administrative [**4] judge noted that because Mr. Kursar's position was probationary, he was not an "employee" within the meaning of *5 U.S.C. § 7511(a)(1)* and therefore had no right to appeal his termination. Based on that preliminary conclusion, the administrative judge issued an order to show cause why the appeal should not be dismissed for lack of jurisdiction. In response to that order, Mr. Kursar alleged that his termination violated USERRA because it was motivated by his status as an Army reservist and/or his 1996 USERRA claim. Because Mr. Kursar was a probationary employee, the administrative judge found that the Board had jurisdiction to hear Mr. Kursar's USERRA claim, but did not have jurisdiction to otherwise review the merits of his termination.

After a hearing held on March 2 and 3, 2004, the administrative judge issued an Initial Decision in August 2004 denying Mr. Kursar's request for relief under USERRA. The administrative judge found that Mr. Blake's and Major Hom's version of the April 22 conversation was credible. In particular, the administrative judge concluded that there was no evidence that Mr. Blake or Major Hom even knew about Mr. Kursar's 1996 USERRA claim [**5] as of April 22, 2002. Thus, although the administrative judge found that Mr. Blake based his decision to terminate Mr. Kursar on a "gut feeling" that was "entirely [based] on the

allegations contained in Major Hom's declaration," the administrative judge concluded that there was no evidence supporting Mr. Kursar's allegation that his termination was motivated by his military status or his 1996 USERRA claim.

In late May of 2004, nearly three months after the hearing, Mr. Kursar's [*309] lawyer-William B. Knowles-obtained a letter from Matthew Johnson, an investigator who worked for the Ministry of the Attorney General in British Columbia. The letter was apparently sent in response to a Freedom of Information Act request that Mr. Knowles pursued after Major Hom's deposition, in which Major Hom said that he had talked to background investigators about Mr. Kursar. In July of 2004, Mr. Knowles was indicted on unrelated matters. Although Mr. Knowles's office had a copy of Mr. Johnson's letter, Mr. Kursar was not able to obtain a copy of the letter until September 29, 2004, through newly hired counsel. On October 4, 2004, Mr. Johnson signed an affidavit swearing to the contents of his earlier [**6] letter. According to the affidavit, Mr. Johnson conducted a background check on Mr. Kursar in 2002, pursuant to an employment application that Mr. Kursar submitted after his termination from the TSA. As part of that background check, Mr. Johnson interviewed Major Hom. According to Mr. Johnson's affidavit, during that interview Major Hom talked about Mr. Kursar's 1996 USERRA claim and stated that he knew about Mr. Kursar's 1996 USERRA claim because he knew the individuals at the sheriff's office who were involved in the claim. According to Mr. Johnson, Major Hom also said that he told Mr. Blake about Mr. Kursar's 1996 USERRA claim. When asked by Mr. Johnson why he told Mr. Blake about Mr. Kursar's 1996 USERRA claim, Major Hom responded, in essence, that he thought it was important for Mr. Blake to know that Mr. Kursar was a "troublemaker" who would not hesitate to make reports against other law enforcement officers.

Although Mr. Johnson's letter was apparently sent in response to Mr. Knowles's Freedom of Information Act request, the record contains no evidence regarding how or when that request reached Mr. Johnson. Based on Mr. Johnson's affidavit, all that the record shows is that [**7] Mr. Kursar's first contact with Mr. Johnson (through Mr. Kursar's lawyer, Mr. Knowles) was in April 2004, and that Mr. Johnson was on vacation and unreachable from February 2004 (just before Mr. Kursar's hearing on March 2 and 3) through mid-April 2004.

Mr. Kursar filed a petition for review of the Initial Decision on October 27, 2004, arguing that Mr. Johnson's affidavit constituted new and material evidence. The Board summarily rejected the petition, and Mr. Kursar appeals.

## DISCUSSION

In his appeal, Mr. Kursar raises two issues. First, Mr. Kursar argues that he was denied due process because he was terminated without an adequate opportunity to respond to Major Hom's allegations. However, because Mr. Kursar was completing a probationary period in an excepted service position-a conclusion Mr. Kursar does not challenge-he has failed to show that he was denied procedural rights to which he was entitled. Under *5 U.S.C. §§ 7511-13*, for purposes of appealing a removal action, a petitioner must be included in one of several possible categories in order to meet the definition of "employee." Mr. Kursar was employed by the TSA on a trial basis for less than one month. [**8] Accordingly, he was not within the statutory definition of "employee" in *section 7511(a)(1)*, regardless of whether he was, as he asserts in his brief, a preference eligible veteran. Because he was not an "employee" under *section 7511*, he was not entitled to the protections of *section 7513*, which include the right to 30 days written notice, an opportunity to respond, and the right to appeal an adverse decision to the MSPB. *See Horner v. Lucas, 832 F.2d 596, 597 (Fed. Cir. 1987)* (holding that [*310] petitioner was not entitled to the protections of *5 U.S.C. §§ 7511(a)(1)* and *7513* because under *section 7511(a)(1)(A)* the temporary status of his position in the competitive service prevented him from qualifying as an employee). And because of Mr. Kursar's status as a probationary employee, the Board correctly concluded that Mr. Kursar had no right to appeal the merits of his termination to the MSPB. [1]

> 1    As a probationary employee, Mr. Kursar lacked a property interest in his position that entitled him to procedural protections under the *Fifth Amendment's Due Process Clause. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); Silva v. Bieluch, 351 F.3d 1045, 1047 (11th Cir. 2003); Williams v. Seniff, 342 F.3d 774, 787 (7th Cir. 2003); Finley v. Giacobbe, 79 F.3d 1285, 1297-98 (2d Cir. 1996).*

[**9] The second issue raised by Mr. Kursar on appeal is whether the Board should have granted his petition for review based on Mr. Johnson's affidavit, which Mr. Kursar contends is new and material evidence supporting his USERRA claim. To prevail on his USERRA claim, Mr. Kursar bore the initial burden of showing that his military status or his past USERRA claim was "at least a motivating or substantial factor" in the agency's decision to terminate him. *Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001)*. By regulation, the Board will grant a petition for review when it finds that "new and material evidence is available that, despite due diligence, was not available when the record closed." *5 C.F.R. § 1201.115(d)(1); see Wright v. U.S. Postal Serv., 183 F.3d 1328, 1332 (Fed. Cir. 1999)*. New evidence is "material" if it is "of sufficient weight to warrant an outcome different from that of the initial decision." *Bucci v. Dep't of Educ., 42 M.S.P.R. 47, 55 (1989)*.

Although Mr. Kursar's petition for review was based on Mr. Johnson's affidavit, neither the TSA in its response to the petition, nor the [**10] Board in its order denying the petition, specifically addressed Mr. Johnson's affidavit. Rather, the TSA simply argued in its response, as it does in its brief in this court, that the initial decision boiled down to a credibility determination--weighing the credibility of Major Hom and Mr. Blake against the credibility of Mr. Kursar--and that Mr. Kursar's "new" evidence merely challenges the administrative judge's credibility determination. That response is incomplete for two reasons. First, while it may be true, as the agency argues, that new evidence regarding witness credibility is rarely material, *see, e.g., Bucci,42 M.S.P.R. at 55*, it is also true that a decision resting entirely on a credibility determination might be affected by evidence that was not presented to the administrative judge, but that directly undermines the central credibility determination, *Wright, 183 F.3d at 1332*. Second, Mr. Johnson's affidavit does more than merely impeach Mr. Blake's and Major Hom's credibility. Rather, it directly contradicts the critical factual determination on which the Initial Decision hinged. The Initial Decision on Mr. Kursar's USERRA claim hinged [**11] on the administrative judge's conclusion that Major Hom and Mr. Blake did not discuss Mr. Kursar's 1996 USERRA claim during their April 22 conversation and that neither of them even knew about Mr. Kursar's past USERRA claim. While that conclusion was reasonable in light of the administrative record at the time of the hearing, Mr. Johnson's affidavit

directly contradicts that critical conclusion based on a statement reportedly made by Major Hom. Not only does Mr. Johnson's affidavit suggest that Major Hom and Mr. Blake knew about Mr. Kursar's 1996 USERRA claim, but it further suggests that the critical conversation between [*311] Major Hom and Mr. Blake focused, at least in part, on Major Hom's assertion that Mr. Kursar was unfit for a TSA position precisely because he had filed a USERRA claim in the past. If that assertion was a motivating factor in Mr. Blake's "gut feeling" to terminate Mr. Kursar, then Mr. Kursar would likely have met his initial burden of showing that his military service or his past USERRA claim was a motivating or substantial factor in his termination, and the agency would have to show that Mr. Kursar would have been terminated regardless of his 1996 USERRA claim and [**12] his military status. *Sheehan, 240 F.3d at 1014.* Contrary to the agency's vague response to Mr. Kursar's petition for review, Mr. Johnson's affidavit was therefore at least facially material.

The full Board's order dismissing Mr. Kursar's petition for review did not refer to the materiality of Mr. Johnson's affidavit. Rather, the Board summarily concluded that Mr. Kursar had presented "no new, previously unavailable, evidence." Similarly, TSA's brief

in this court asserts, without much elaboration, that Mr. Johnson's affidavit was not "new" evidence. The record, however, shows that Mr. Johnson's first contact with Mr. Kursar was in late April 2004, more than a month after Mr. Kursar's hearing, and that Mr. Kursar did not obtain Mr. Johnson's letter and his affidavit until after the administrative judge's decision in the case. If, despite due diligence, Mr. Kursar could not have obtained the evidence before the record closed, Mr. Johnson's affidavit would appear to be "new."

Although we do not conclude here that Mr. Johnson's affidavit was new or material, we believe the record, in its current state, does not support a conclusion that substantial evidence shows that [**13] the affidavit did not constitute "new and material" evidence. Further proceedings are necessary to ascertain whether Mr. Johnson's affidavit was new and material evidence and, if so, whether that evidence, if considered by the administrative judge, would result in a different outcome in this case. We therefore vacate the Board's order and remand this case to the Board for further proceedings addressed to Mr. Kursar's new and material evidence claim.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

# EXHIBIT G

LEXSEE 2008 MSPB LEXIS 497

ROBERT A. KURSAR, Appellant, v. DEPARTMENT OF HOMELAND SECURITY, Agency.

DOCKET NUMBER SE-315H-03-0187-B-3

MERIT SYSTEMS PROTECTION BOARD

*2008 MSPB LEXIS 497*

January 29, 2008

**COUNSEL:**
[*1]

Gary M. Gilbert, Esquire, Silver Spring, Maryland, for the appellant.

Kevin L. Owen, Esquire, Silver Spring, Maryland, for the appellant.

Steven E. Colon, Esquire, Arlington, Virginia, for the agency.

**OPINION BY:** SPENCER

**OPINION:**

**BEFORE**

Neil A. G. McPhie, Chairman

Mary M. Rose, Vice Chairman

Barbara J. Sapin, Member

**FINAL ORDER**

The appellant has filed a petition for review in this case asking us to reconsider the initial decision issued by the administrative judge. We grant petitions such as this one only when significant new evidence is presented to us that was not available for consideration earlier or when the administrative judge made an error interpreting a law or regulation. The regulation that establishes this standard of review is found in Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).

After fully considering the filings in this appeal, we conclude that there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome. 5 C.F.R. § 1201.115(d). Therefore, we DENY the petition for review. The initial decision of the administrative judge is final. This [*2] is the Board's final decision in this matter. 5 C.F.R. § 1201.113.

**NOTICE TO THE APPELLANT REGARDING YOUR FURTHER REVIEW RIGHTS**

You have the right to request the United States Court of Appeals for the Federal Circuit to review this final decision. You must submit your request to the court at the following address:

2008 MSPB LEXIS 497, *2

United States Court of Appeals

for the Federal Circuit

717 Madison Place, N.W.

Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with the court no later than 60 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management, 931 F.2d 1544 (Fed. Cir. 1991).*

If you need further information about your right to appeal this decision to court, you should refer to the federal law that [*3] gives you this right. It is found in Title 5 of the United States Code, section 7703 *(5 U.S.C. § 7703).* You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

FOR THE BOARD:

William D. Spencer

Clerk of the Board

Washington, D.C.

**Legal Topics:**

For related research and practice materials, see the following legal topics:

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# EXHIBIT H

```
 1     Let's take a short break.
 2                         (Recess 2:06 p.m. - 2:22 p.m.)
 3
 4                         ADMINISTRATIVE JUDGE:  We're ready
 5     to go on the record with Mr. Blake.
 6                         <<<<<< >>>>>>
 7
 8                         WILLIAM BLAKE, having been first
 9                         duly sworn on oath testified as
10                         follows:
11
12                         ADMINISTRATIVE JUDGE:  Would you
13     state your first and last name for the record, please?
14                         THE WITNESS:  William Blake.
15                         ADMINISTRATIVE JUDGE:  Whenever
16     you're ready, Mr. Knowles.
17
18                         DIRECT EXAMINATION
19     BY MR. KNOWLES:
20  Q  Mr. Blake, can you tell us please who you are employed
21     by?
22  A  Federal Air Marshal Service.
23  Q  How long have you been with the Federal Air Marshal
24     Service?
25  A  A little over two years, I believe.
```

1    Appellant discharged without personal notice,

2    resignation, conditional ILO elimination."

3         First of all, did I read the statement in your

4    declaration correctly?

5  A  Yes.

6  Q  In fact, there was no DD214; it's a National Guard

7    Bureau document we're looking at, right?

8  A  That's correct.

9  Q  And you didn't know the difference when you were

10   talking or filling out this declaration, correct?

11 A  That's correct.

12 Q  And I asked you in your deposition about that same --

13   it says, "Soldier discharged without personal notice,

14   resignation, Box 18, conditional ILO elimination."

15        That's the same words that appear in your

16   declaration.  Isn't that correct?

17 A  That's correct.

18 Q  And I asked you what does that mean, and you told me,

19   Answer:  "I don't know," right?

20 A  That's correct.

21 Q  And so you don't know what that means, right?

22 A  I have since --

23 Q  At the time I took your deposition.

24 A  At the time you took my deposition, that's correct.

25 Q  At the time you made the decision in this case, you

1     didn't know what it meant.  Isn't that true?

2  A  That's true.

3  Q  I asked you in the same deposition -- I said,

4     Question:  "Can you tell me where within the four

5     corners of this document it says he was terminated

6     from the National Guard?"

7        Answer:  "I don't see the word 'terminated' on

8     this document."

9        "And yet this is the document you say shows he was

10    terminated.  Can you explain that for me, please?"

11       Answer:  "No explanation."

12       Did I read that correctly from your deposition?

13  A  I don't know where you're reading from.

14  Q  Page 44 of your deposition.

15  A  Okay.

16  Q  Line 7 to Line 14.

17  A  Okay.

18  Q  Did I read that correctly?

19  A  Yes.

20  Q  You had no explanation for your belief or finding that

21    it says that he was terminated when I questioned you,

22    did you?

23  A  That's true.

24  Q  Okay.  And in fact, at the time you wrote this

25    declaration, you relied on someone else to interpret

1          ADMINISTRATIVE JUDGE:  F as approved

2     by me today?

3                    MR. KNOWLES:  That's correct, Your

4     Honor.

5  Q    BY MR. KNOWLES:  Directing your attention to Page 3 of

6     that, do you have that in front of you?

7          There's a question that says, "Please produce a

8     copy of all materials faxed to Donna Bentley by

9     William Blake regarding Appellant," and the Agency's

10    response is that, "Ms. Bentley was not employed by the

11    Agency during the time frame of Appellant's

12    employment."  That's the official answer of the

13    Agency.

14         Do you still believe Donna Bentley was the person

15    you spoke to?

16 A    Yes.

17 Q    And why is that?

18 A    Because I spoke with Donna Bentley.

19 Q    About Mr. Kursar?

20 A    Yes.

21 Q    So you have no explanation as to why the Agency said

22    she was not employed at that time?

23 A    I have no idea.

24                    MR. KNOWLES:  We move for that

25    portion of the answer to be admitted, Your Honor.

Byers & Anderson, Inc. - Court Reporters & ...

```
 1  Q   You're not familiar with this form?

 2  A   I filled it out a couple times in my career, but I

 3      have not studied it.

 4  Q   Isn't Question 19 dealing with military record?

 5  A   Yes, your military record, Question 19.

 6  Q   Now, Question No. 20 deals with civilian employment,

 7      doesn't it?

 8  A   22?

 9  Q   Yes, 22 deals with civilian employment, doesn't it?

10  A   I believe that.

11  Q   And in fact, on that particular question, does

12      Mr. Kursar indicate that he has answered providing or

13      indicating that he was terminated from employment?

14  A   He checked the box "yes."

15  Q   What employment is it that he indicates he was

16      terminated from?

17  A   Military leave.

18  Q   Is that the employment he was terminated from,

19      military leave?

20          Who was the employer?

21  A   Whatcom County.

22  Q   Whatcom County Sheriff, is that what it says?

23  A   Somebody, Whatcom County, somebody in Bellingham.

24  Q   So he's disclosing that he was terminated from Whatcom

25      County on or about when?
```

1  A   2/96.

2  Q   Now, where on there is it that he failed to disclose

3      that he was separated from the National Guard?

4          Is that a question that's even asked there?

5  A   I don't see the question.

6  Q   It wouldn't be a reasonable response to the question

7      that is being posed, is it?

8  A   I would say so.

9  Q   You would say what?

10 A   It would be a reasonable response.

11 Q   It would be a reasonable response?  You believe that

12     the Army National Guard is a job?

13 A   I would say yes, it is.

14 Q   I see.  So you don't believe it's covered by military

15     record.  Is that right?

16 A   That the Army National Guard is?

17 Q   Yes.  Which is Army National Guard, civilian or

18     military employment?

19 A   I would think that the National Guard would fall under

20     military.

21 Q   Right.  So a termination from the National Guard would

22     have been reported in Box No. 19 if the question had

23     been asked, right?

24 A   And Box 19 speaks to --

25 Q   Box 19 is the one that deals with military employment.

1    Is that right?

2                    MR. ABRAMSON:   Objection, Your

3    Honor.  The document is no longer in front of

4    Mr. Blake to the best of my knowledge.

5                    MR. KNOWLES:   I'm sorry.  I was

6    coming back to look for a portion of his deposition.

7  Q  BY MR. KNOWLES:   Question 19 deals with military

8    employment, right, military records?

9  A  Yes.

10 Q  22 deals with your employment record?

11 A  Yes.

12 Q  Mr. Kursar has provided information that indicates

13   that, in fact, he was separated from Whatcom County,

14   right?

15 A  Yes.

16 Q  The specifications in the charges is that in Box 22,

17   he stated that he had not been terminated from the

18   Washington National Guard.  Is that correct?

19 A  You're speaking to Paragraph 10?

20 Q  19.  Yes, Paragraph 10 of your statement, that is

21   correct, your declaration.

22 A  What's your question again, please?

23 Q  Let me just ask you, I'm going to turn to your

24   deposition here.

25        Let's just take the deposition out so we don't

1    have to go through this.  Okay?  Page 51 of your

2    deposition, please.

3        Do you have that in front of you, Mr. Blake?

4  A  Yes, I do.

5  Q  Let's start off reading Page 51, Line 12, "The first

6    problem I understand you're raising is that in

7    Question 22 you failed to state you were terminated

8    from the Washington Air National Guard in June 1996,

9    correct?"

10       Answer:  "Yes."

11       "Now I'm looking at Question 22.  And there he

12   reveals that, in February of '96, he was fired from a

13   job or left a job for reasons under unfavorable

14   circumstances.  Specifying the reasons.  Military

15   leave from Whatcom County.  Then he gives an address,

16   correct?"

17       Answer:  "Yes."

18       "Okay.  Now, first of all is this a place where an

19   entry would be made about a separation from military

20   service?"

21       Answer:  "That I'm not -- I can't speak with

22   authority to that.  That would be an HR question."

23       Did I read that correctly from your deposition?

24  A  Yes, Line 3 on Page 52.

25  Q  So you don't know whether that's where military

1      service goes or not, right?

2  A   True.

3  Q   From looking at the form here, you can't really answer

4      the question about whether or not he was supposed to

5      put that information about the Washington National

6      Guard down there in Box 22 or not, right?

7  A   I don't know.

8  Q   You don't know.  You signed the letter though

9      terminating him for failure to answer Question 22

10     correctly, didn't you, Mr. Blake?

11 A   Well, that I did.

12 Q   Okay.  But you don't know whether he did it right or

13     wrong.  Isn't that true?

14 A   That's true.

15 Q   Thank you.  Let's take a look at -- let's take a look

16     at the other question that you have here, which is you

17     say that in Question No. 28, right?

18 A   26.

19 Q   26, pardon me -- "He failed to disclose that he had

20     had a security clearance suspended or revoked."

21        Isn't that what you said?

22 A   Yes.

23 Q   And the question as stated in the questionnaire form,

24     would you read that?

25        That's 26B, correct?

1  A  "To your knowledge, have you ever had a clearance or

2      access authorization denied, suspended or revoked; or

3      have you ever been debarred from government

4      employment?  If yes, give date of action and agency.

5      No if the administrative downgrade or termination of a

6      security clearance is not a revocation."

7  Q  Now, you have no information as you sit here today to

8      show me that Mr. Kursar's security clearance was ever

9      suspended or revoked, do you?

10  A  No.

11  Q  So it's entirely possible that he completely

12      truthfully answered that question.  Isn't that right?

13  A  It's possible.

14  Q  And it's actually possible that he accurately answered

15      the question in Box 22.  Isn't that right?

16  A  It's possible.

17  Q  Are you the person that proposed that he be

18      terminated?

19  A  Yes.

20  Q  And how did you do so?

21  A  I determined that from the statement that Major Hom

22      gave me --

23  Q  Yes.

24  A  -- which question -- which put in my mind, if I can

25      use this word, a questionability of Kursar's

*3/2/04 - William Blake, Direct by Mr. Knowles*      160

1  Q   That would be a yes or no.  You didn't, correct?

2  A   Say it again.

3  Q   You did or did not question him about whether or not

4      he had personal knowledge of these?

5  A   No, I did not.

6  Q   Okay.  And you did not look at the 86 Form to see

7      which questions it was Mr. Kursar supposedly didn't

8      answer, did you?

9  A   I saw the 86 Form.  I believe I saw the 86 Form

10     Question 22 and 26.

11 Q   You saw those answers?

12 A   Yes.

13 Q   Now, I'm asking you -- but you've told us you're not

14     qualified to tell us whether or not the separation

15     from the Washington National Guard, if it existed,

16     should have been reported in 22 or 19, right?

17         You don't know where it should have been reported,

18     right?

19 A   True.

20 Q   And you don't have any information to tell you whether

21     or not Mr. Kursar's security clearance was ever

22     suspended or revoked, do you?

23 A   Me personally, I don't.

24 Q   And you've never seen any document that says that,

25     have you?

1   A   Me personally, I haven't.

2   Q   And so all the information you have in this situation

3       is all through someone else who made that

4       determination.

5           Is that your testimony?

6   A   And in Human Resources, yes.

7   Q   And you don't know who that was?

8   A   I can't say.

9   Q   Do you believe though it was Donna Bentley?

10  A   Or Carolyn Donohue, one of the two.

11  Q   And that's the letter of proposal, right?

12  A   April 25, yes.

13  Q   That letter of proposal was prepared by someone in HR;

14      they prepared the content, they sent it to you, they

15      did all the investigation, you don't know anything

16      more about it, right?

17  A   This is based on what I gave them initially.

18  Q   Which was?

19  A   The letter from Hom.

20  Q   That's all that it was based on?

21  A   No.  When I gave them the letter from Hom --

22  Q   Right.

23  A   -- I have to believe that HR vetted it out.

24  Q   Why do you have to believe that?

25  A   That's their process.  That's their job.

1  Q  Mr. Kursar explains in here about a problem he ran

2     into with his former employer, Whatcom County.  Is

3     that correct?

4  A  I don't know.  I'll take your word for it.

5  Q  You didn't read it?

6  A  I didn't read that, no.

7  Q  So all you did was glanced at the DD214?

8  A  Yes.

9  Q  You decided it supported what Hom said.

10     And based on that, you just decided that you had

11     to terminate him.  Is that right?

12  A  I glanced at the document, what I thought was the

13     DD214 Form.  Now I know it's the NGB22, specifically

14     Block 18.

15     In addition to what Hom shared with me, and the

16     fact that he was on probation, I made a decision this

17     isn't something that I should be dealing with at this

18     point, because the building of the Agency is being

19     built on integrity, it's being built on

20     trustworthiness.

21     And if I'm not comfortable with this individual, I

22     can use the tool that the system has given me which is

23     during the probation period of time to terminate

24     someone.  I made that decision.

25  Q  Okay.  As you sit here today though, you can't

```
 1        There's two allegations.  One is you didn't tell
 2     us you were terminated from the National Guard, and
 3     the other one is you didn't tell us your security
 4     clearance was suspended or revoked, true?
 5   A  True.
 6   Q  Major Hom never mentioned any security clearance
 7     questions, did he, in his statement?
 8   A  He said he was terminated from the -- he said he was
 9     terminated from the -- I would have to refer back to
10     Major Hom's statement.
11   Q  Yes, please do.  Why don't you see if there's any
12     mention of the security clearance in that statement.
13   A  There's no mention of a security clearance.
14   Q  All right.  And there's nothing in the -- you have no
15     documents you received showing anyplace that his
16     security clearance was suspended or revoked, do you?
17   A  No, I didn't.
18   Q  You can't point to anybody who's told you that his
19     security clearance was suspended or revoked?
20   A  No.
21   Q  Okay.  Where is it that you come up with the
22     information then to sustain the removal on the basis
23     that his security clearance was suspended or revoked?
24        Where does that information come from?
25   A  That I don't know.  Are you saying that's in my -- I'm
```

1       not following you there.   Where is that question

2       coming from?

3    Q  By letter -- your letter to him May 3rd, by letter

4       dated April 21st giving notice proposing your removal

5       during your probationary period.   "The proposal was

6       issued because you submitted an official document that

7       contained false and/or misleading information.   I have

8       carefully considered your written response to the

9       charges dated April 29, 2002.   I have determined the

10      facts support the proposed action.   I have therefore

11      decided I will promote the efficiency of the service

12      and terminate you from federal employment.   This

13      termination actually will be effective the close of

14      business May 8, 2002."

15         You wrote that to Mr. Kursar, right?

16   A  Right, true.

17   Q  But you had no information about his security

18      clearance when you wrote that, right?

19   A  I'm sure someone in headquarters confirmed it.

20      Otherwise I wouldn't have written it.

21   Q  You can't tell me who it was who confirmed it?

22   A  I can't tell you.

23   Q  And Mr. Kursar identified Ms. Watkins in his letter,

24      and you never contacted her?

25   A  Okay.

1  Q   Right?

2  A   I never contacted Ms. Watkins.

3  Q   Mr. Kursar told you that he never had his security

4      clearance suspended or revoked when he wrote to you,

5      right?

6  A   I didn't read that in the letter.

7  Q   Is that, I didn't read the letter?

8  A   No.   I skimmed through the letter.   I didn't study the

9      letter.

10 Q   How about if you look at the paragraph identified as

11     Paragraph 2 right here in the letter.

12         What's the subject of that Paragraph 2 if you

13     didn't -- if you even skimmed it, what's the subject

14     of it?

15 A   The first line talks about never having security

16     clearance suspended or revoked.

17 Q   Okay.   So Mr. Kursar denied the charges, right?

18     Correct?

19 A   According to that paragraph there in the letter he

20     did, yes.

21 Q   Your letter to him says, I have carefully considered.

22         How did you carefully consider this if you only

23     skimmed it?

24 A   Well, the information that was given to me from HR

25     would have -- would have vetted out that process so --

1  Q   What information did you get from HR?

2  A   That I don't recall.  I'm sure they vetted something

3      out in order to --

4  Q   Mr. Donohue says that she received the April 25

5      letter, the proposal from you, along with the

6      documents that are behind Tab M, and that she never

7      conducted any investigation of this matter.

8                      MR. ABRAMSON:  Your Honor,

9      objection --

10 A   Okay.

11                     MR. ABRAMSON:  -- assuming facts not

12     in evidence.  Ms. Donohue has not given testimony at

13     this time.

14                     MR. KNOWLES:  He's got the

15     deposition of Ms. Donohue.  He knows exactly what

16     Ms. Donohue says.

17                     ADMINISTRATIVE JUDGE:  If you want

18     to pose it as a hypothetical.

19                     MR. KNOWLES:  All right.  That's a

20     hypothetical question.

21 Q   BY MR. KNOWLES:  Assuming Ms. Donohue said she

22     conducted no investigation, that she only went on the

23     information that you provided her which was the

24     proposed Notice of Removal and the documents that are

25     contained behind Tab M, what kind of investigation is

1    that, Mr. Blake?

2  A   I don't know.

3  Q   Would you agree with me that's no investigation at

4    all?

5  A   I wouldn't agree with you on that, because I don't

6    know what they did.

7  Q   Right.  You have no evidence of what they did?

8  A   I don't know what they did.

9  Q   And yet you wrote a letter saying you carefully

10    considered all this information.

11        But in fact, you considered nothing.  Isn't that

12    right, Mr. Blake?

13             MR. ABRAMSON:  Objection, asked and

14    answered, Your Honor.

15             ADMINISTRATIVE JUDGE:  Yes.  We've

16    been going over this now for quite a while.  I think

17    we can move on.

18             MR. KNOWLES:  That's fine.

19  Q   BY MR. KNOWLES:  Now, Mr. Kursar actually had a

20    conversation with you about his termination from the

21    Whatcom County Sheriff's Department, didn't he?

22  A   I don't recall that conversation.

23  Q   Didn't he tell you that he had been terminated because

24    he was going out on National Guard service for

25    leave --

1             MR. KNOWLES:  We would move that

2     this be marked and identified as Appellant's Exhibit G

3     in this matter.

4                     ADMINISTRATIVE JUDGE:  Any

5     objection?

6                     MR. ABRAMSON:  No objection, Your

7     Honor.

8  Q  BY MR. KNOWLES:  As of April 23, 2002, what

9     information did you have available to you other than

10    the statement of Mr. Hom?

11 A  What information did I have available to me for what?

12 Q  Of any kind, other than the statement of Mr. Hom.

13 A  To me the question is incomplete.

14 Q  Did you have any information, other than the statement

15    of Mr. Hom, that caused you to issue this document,

16    Exhibit G?

17 A  I had -- the information that I had was what Hom gave

18    me.

19 Q  Yes.

20 A  And then what I -- I guess my gut feeling as a leader.

21    I had to take a look at what Hom --

22 Q  Thank you.  You had no other information on what

23    Mr. Hom had given you?

24 A  May I finish?

25                     ADMINISTRATIVE JUDGE:  You said

1    Hom's statements and your gut feeling.  Does that

2    complete your answer?

3  Q  BY MR. KNOWLES:  Is there any other information you

4    had?

5  A  As far as information, those are the only two pieces

6    of information you're saying that I had, sir?

7               ADMINISTRATIVE JUDGE:  That's what

8    you testified to, and there's a follow-up question.

9    Did you have any other information?

10              THE WITNESS:  No, sir.

11  Q  BY MR. KNOWLES:  Now, I take it your gut feeling isn't

12    something that had documentation that attaches to it,

13    right?

14  A  No:  But in law enforcement, gut feeling has a lot to

15    do with it.

16  Q  Thank you, thank you.  So the only documentation you

17    had was Major Hom's statement, right?

18  A  Yes, sir.

19             MR. ABRAMSON:  As of which date?

20             MR. KNOWLES:  As of the 23rd.

21  A  Yes.

22  Q  BY MR. KNOWLES:  You had not talked to anybody back

23    east, right?

24  A  I believe I did.

25  Q  Who did you talk to?

1   A    Someone in HR.

2   Q    But you don't know who that person was?

3   A    I can't remember.

4   Q    As of April 23, let me just ask you, did you know that

5         Major Hom had been replaced by Mr. Kursar on a mission

6         in Thailand?

7   A    No, I didn't.

8   Q    Did you know that the person he was referring to there

9         was the -- Mr. -- the gentleman who he identifies

10        in -- who Major Hom identified in his statement, Larry

11        Gibson, was Mr. Kursar's ostensive father-in-law or

12        the father of his girlfriend?

13   A    No, sir. I didn't know that.

14   Q    Would that have been information that would have been

15        relevant to you in making a determination?

16   A    It wouldn't have mattered at that point.

17   Q    Because what?

18   A    Because my job as the acting special agent in charge

19        was to make sure that everyone that was in that office

20        was up to par on integrity, the ability to be trusted,

21        my confidence in them.

22           I was developing a community for the Agency. And

23        anything that threatened that community, I used the

24        tool that was given to me, probation, and I acted on

25        it.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT KURSAR | * |
| | * |
| Plaintiff, | * |
| | * Civil Action No. 07-2001 (RBW) |
| v. | * |
| | * |
| TRANSPORTATION SECURITY | * |
| ADMINISTRATION | * |
| et al. | * |
| | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

# EXHIBIT I

1            ADMINISTRATIVE JUDGE:  We're back on

2     the record.

3          And the Agency has provided the e-mail from

4     William Blake to Carolyn Donohue dated May 3, 2002 and

5     provided a copy to the Judge and to the Appellant's

6     representative.  He has also provided a memo dated

7     April 16, 2002 which appears to indicate that

8     Mr. Kursar, the Appellant, signed for his cellphone on

9     April 22, 2002, and the second page a call detail.

10    We'll take these up after we take the first witnesses.

11    And I believe the next witness is Carolyn Donohue.

12         Do you either of you folks have a number for her?

13                 MR. KNOWLES:  Yes.  I believe it's

14    on the --

15                 ADMINISTRATIVE JUDGE:  I don't see

16    it on here.

17                 MR. KNOWLES:  That's because she's

18    the government's witness.

19                 (Discussion off the record.)

20                 <<<<<<  >>>>>>

21

22                 CAROLYN DONOHUE, (via

23                 telephone) having been first duly

24                 sworn on oath testified as follows:

25

1  Q   -- would not be a place to mark or identify civilian

2      employment, would it?

3  A   No.   There's another section for that.

4  Q   And Section 22 is that section that asks the question,

5      "Has any of the following happened to you in the last

6      seven years?  If yes, begin with the most recent

7      occurrence and go backwards providing date fired, quit

8      or left and other information requested."

9  A   To the best of my recollection, that's what it says,

10     yes.

11 Q   I'm reading right from the form, ma'am.

12 A   Okay.

13 Q   Is that a place where you should identify separations

14     from the National Guard?

15 A   No.

16 Q   And how do you know that to be the case?

17 A   Well, it's clear from the question that it asks for

18     fired or left under circumstances, and it has another

19     previous question earlier on about your military

20     record.  Having put that in the military section, I

21     wouldn't think that anybody would be rightly to place

22     it in their other kind of work-related experiences.

23 Q   And then the question on military record, "Have you

24     ever received other than an honorable discharge from

25     the military?  If yes, provide details of discharge

*Byers & Anderson, Inc. - Court Reporters & Video*

```
 1       question.

 2   Q   BY MR. KNOWLES:  Ms. Donohue, why didn't you tell

 3       me -- why did you not tell me about any other

 4       documents you had?

 5   A   The documents that I have today, sir, were gotten out

 6       of various places to prepare for this trial.  The only

 7       documents I relied on in taking action against

 8       Mr. Kursar were the proposal letter, the letter from

 9       Major Hom and Mr. Kursar's response.

10   Q   That's it?

11   A   That's it, sir.

12   Q   Was there any investigation of the allegations that

13       were made by Major Hom conducted by you?

14   A   None by me, sir, no.

15   Q   Did you receive any report of any investigation that

16       was done?

17   A   Nope.

18   Q   Is that a no?

19   A   No.  That's a no.

20   Q   And to the best of your knowledge, there's never been

21       any investigation into Mr. Hom's allegations.  Is that

22       correct?

23   A   To the best of my knowledge, that would be correct.

24   Q   Now, the termination letter itself, you prepared that.

25       Is that correct?
```

1  A   Yes, I did.

2  Q   And why did you prepare the termination letter?  At

3      whose direction?

4  A   I did speak to Mr. Blake about Mr. Kursar's response,

5      and Mr. Blake told me he had lost confidence in

6      Mr. Kursar's ability.

7          Remember the job is basically on your own, no

8      supervision, 35,000 feet in the air with a gun, so he

9      lost confidence in Mr. Kursar's ability.  Mr. Kursar

10     was a probationary employee, and he asked me to do the

11     termination letter.

12 Q   And it was Mr. Blake's decision to have him

13     terminated?

14 A   That would be correct.

15 Q   It was not your decision?

16 A   No.  I only advise and assist, sir.  That's my only

17     role.

18 Q   And in the telephone call that Blake had with you, he

19     told you that he wanted him terminated?

20 A   To the best of my recollection, yes.  Obviously the

21     outcome was he was terminated, so that would be the

22     best of my recollection.

23 Q   So was there any question in Mr. Blake's mind at this

24     time, as far as you could tell, whether he knew that

25     he had authority to request that Mr. Kursar be

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |
| * * * * * * * | * | * * * * * * * |

# EXHIBIT J

1                    UNITED STATES OF AMERICA
                  MERIT SYSTEMS PROTECTION BOARD
2                      SEATTLE DISTRICT OFFICE

3    ROBERT KURSAR,                    )
                                       )
4                   Appellant,         )
                                       )
5        vs.                           )    NO. SE-315H-03-0187-I-1
                                       )
6    DEPARTMENT OF TRANSPORTATION,     )
                                       )
7                   Agency.            )

8    ─────────────────────────────────────────────────────

                    DEPOSITION OF WILLIAM BLAKE
9
     ─────────────────────────────────────────────────────
10       APPEARANCES:
                          FOR THE APPELLANT:
11
                          WILLIAM B. KNOWLES
12                        Attorney at Law
                          2505 Second Avenue, Suite 620
13                        Seattle, Washington 98121

14                        FOR THE AGENCY:

15                        HARRY S. ABRAMSON
                          Attorney at Law
16                        Transportation Security Administration
                          U.S. Department of Homeland Security
17                        Washington, D.C. 20528

18                        ALSO PRESENT:

19                        Robert Kursar

20   October 21, 2003
     Seattle, Washington
21

22              COURT REPORTING OFFICES OF
                ROBERT L. T. THOMAS, SR.
23                 (CSR) INCORPORATED
                   913 North 36th Street
24                   Renton, WA 98056
                     (425) 271-0332
25



1              And it says following investigation by FAM HR, I

2    was advised that Appellant had, in fact, been terminat-

3    ed from the Washington Army National Guard in 1996.

4    This fact was confirmed by Appellant's own Report of

5    Separation and Record of Service (DD-214), a copy of

6    which is attached as Exhibit B.

7              Okay?

8    A    Okay.

9    Q    That's what it says; right?

10   A    Yes, that's what it says.

11   Q    Okay.

12             And Exhibit B was the document that Mr. Kursar gave

13   you; correct?

14   A    It would have to be.

15                  MR. ABRAMSON:  Do we have Exhibit B attached?

16                  MR. KNOWLES: It's not attached.

17                  MR. ABRAMSON:  Well, let's make sure he has a

18   copy.

19                  MR. KNOWLES:  Well, let's just --

20                  MR. ABRAMSON: (Interposing)  I don't want him

21   to testify to documents, as you pointed out --

22                  MR. KNOWLES: (Interposing)  Is there a ques-

23   tion pending to him?

24                  MR. ABRAMSON:  Yeah.

25                  MR. KNOWLES:  What was the question?

```
1        18, conditional ILO elimination.
2            What does that mean?
3    A   I don't know.
4    Q   So, this is the document that you said shows that he
5        was separated -- or terminated by the Washington Na-
6        tional Guard.
7            Can you tell me where, within the four corners of
8        this document, it says that he was terminated from the
9        Washington National Guard?
10   A   I don't see the word "terminated" on this document.
11   Q   And yet this is the document that you say shows you
12       that he was terminated.
13           Can you explain that for me, please?
14   A   No explanation.
15   Q   So, you'll agree with me that you're not knowledgeable
16       about what the terms that are contained in this docu-
17       ment, that's otherwise marked as Exhibit B, might mean,
18       the words that are written here; is that correct?
19   A   That's correct.
20   Q   Did someone tell you that this meant that he was termi-
21       nated?
22   A   I would say that that was the case.
23   Q   Who was that person that told you that this meant he
24       was terminated?
25   A   It would have had to have been Human Resource.
```

1    Q    So, you don't believe this is that document?  You don't

2         believe that this document is a DD-214, do you?

3    A    This document (Indicating) is not a DD-214.

4    Q    All right.

5              Okay.

6              But that's what you attached as Exhibit B.  I be-

7         lieve your counsel's just shown that to you and you've

8         told me that that's the case.

9    A    Okay.

10   Q    So, this document that you attached to your affidavit

11        saying this is Exhibit B to my affidavit as a DD-214,

12        it's not a DD-214, is it?

13   A    That's correct.

14   Q    It's what?

15   A    It's a Report --

16   Q    (Interposing)   It's an NGB document; right?

17   A    What's an NGB?

18   Q    National Guard Bureau document.

19   A    That's exactly right.

20   Q    It's not a DD-214 because that's only issued for what,

21        active duty; right?

22   A    Possibly so, yes.

23   Q    So, you'll agree with me that your own statement that

24        you signed under penalty of perjury, when it references

25        a DD-214, contains an error?

1    A    Contains an error.

2    Q    Do you believe there might be more than one error in

3         this document you signed under penalty of perjury?

4    A    To the best of my ability, no.

5    Q    Do you believe that ability is what we should be going

6         by here or isn't it your obligation as a federal offi-

7         cer who's signing a statement in connection with the

8         separation of employment to make certain that the

9         information's accurate, not just to the best of your

10        ability, that if for example you don't know something,

11        to find someone who can assist you to make certain the

12        information is accurate?

13             Do you agree with that premise?

14   A    I agree that the information in this document should be

15        accurate.

16   Q    You'll agree with me it's not accurate, won't you?

17   A    That particular information, yes.

18   Q    And, in fact, you'll agree with me you don't know

19        whether or not the information contained -- you know

20        for sure the information contained in Paragraph 9 of

21        your declaration is in error.

22             Why don't you take a look at it?

23             It's right there in front of you.

24             Paragraph 9.

25   A    (Complying).

1   right?

2   A   Right.

3   Q   So, if Mr. Kursar doesn't know about it, if something's

4       happened and he answers, no, that's a truthful state-

5       ment?

6   A   That's a truthful statement.

7   Q   Okay.

8       So, you'll agree with me that it's entirely possi-

9       ble, based on what I've just shown you here, that Mr.

10      Kursar answered both of those questions correctly on

11      this form?

12  A   It's possible.

13  Q   Yeah.

14      And there's nothing Major Hom said about his secu-

15      rity clearance; right?

16      You want to refer to Exhibit 1?

17  A   No, there's no reference.

18  Q   So, you don't know where that came from, do you?

19  A   About his security clearance?

20  Q   Yeah.

21  A   Possibly headquarters -- I mean HR.

22  Q   You don't know who told you that, do you?

23  A   I don't recall.

24  Q   At one time, did you know?

25  A   I can't recall.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROBERT KURSAR | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-2001 (RBW) |
| v. | * | |
| | * | |
| TRANSPORTATION SECURITY | * | |
| ADMINISTRATION | * | |
| et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# EXHIBIT K

Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KURSAR, ROBERT A | | | 05-08-02 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code / 6-B. Nature of Action | | 5-A. Code / 6-B. Nature of Action | |
| 385 TERMINATION DURING PROB/TRIAL PER | | | |
| 5-C. Code / 5-D. Legal Authority | | 6-C. Code / 6-D. Legal Authority | |
| ZVB P.L. 104-50 | | | |
| 5-E. Code / 5-F. Legal Authority | | 6-E. Code / 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| CIVIL AVIATIN SECURITY SPECIALIST PD NO=CT-NSEAG  BU NO=CTNSEAG  ORG=CT700N  CST CNTR=F10N | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FV | 1801 | G | 00 | $58,679 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $42,000 | $4,943 | $46,943 | $11,736 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| TECHNICAL CENTER ATLANTIC CITY AIRPORT, NJ 08405 ASSOC ADMIN FOR CIVIL AVIATN SECURITY OFFICE OF CIV AVIATN SECURITY OPS FEDERAL AIR MARSHAL DIVISION | — |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|
| 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other  2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 0 - None  2 - Conditional  1 - Permanent  3 - Indefinite | | YES ☐  NO ☒ |
| 1 | 2 | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0 BASIC LIFE ONLY | 9 NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| M FERS-SPEC & FICA | 12-15-00 | F | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General  2 - Excepted Service  4 - SES Career | N  E - Exempt  N - Nonexempt | SEE REMARKS BELOW | 8888 |
| 2 | | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 53-1960-033 | SEATTLE, KING, WA |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| SP PROG=00 | SUPV CSC=8 | POS TYPE=1 | | POSITION SENSITIVITY = 3 |

**45. Remarks**

APPROP = X01 .4 /000/462  /F10N00/1111
SALARY IN BLOCK 12A IS BASED ON PAY BAND G, TECHNICAL JOB CATEGORY, LEVEL 1.
SALARY IN BLOCK 12C INCLUDES A LOCALITY-BASED PAYMENT OF 11.77%. SALARY IN
BLOCK 12 INCLUDES AVAILABILITY PAY OF $11,736. ELIGIBLE TO ELECT TEMPORARY
CONTINUATION OF HEALTH BENEFITS GROUP COVERAGE BY CONTACTING THE EMPLOYING
OFFICE IMMEDIATELY.  FWD ADDRES = #17 2345 CRANLEY DR, SURRACY, BC,  00000
REASON SEP = TERMINATION DURING PROBATIONARY PERIOD

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF TRANSPORTATION/FAA | PERSONNEL MANAGEMENT SPECIALIST |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| TD-03 | 1154 | 05-09-02 | |

J-Part

2 - OPF Copy - Long-Term Record -- DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 8/30/93
NSN 7540-01-333-6236

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion, supporting documents and proposed order have been served by First-Class Mail, postage prepaid to:

CLAIRE WHITAKER
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530

on this 5st day of March, 2008

ROBERT KURSAR
#17-2345 Cranley Drive
Surrey, B.C., Canada
V4A 9G5